

EXHIBIT C

UNITED STATES TRUSTEE'S OFFICE
SOUTHERN DISTRICT OF NY     2004 EXAMINATION

----------------------------------------X

IN THE MATTER OF:

    RE: DEBTOR:
    PEDRO LIMA

                               Case No.:
                               10-11809


----------------------------------------X

                    August 27, 2010

HELD AT:          Office of the U.S. Trustee
                  New York, NY

BEFORE:           NAZAR KHODOROVSKY, ESQ.
                  Trial Attorney

APPEARANCES:      DAVID HAMILTON, ESQ.
                  Attorney for the Debtor
                  LAW FIRM OF DWYER & ASSOCIATES
                  11 Broadway, Suite 615
                  New York, New York 10004


TRANSCRIBER:      JOYCE A. WASER

```
                        I N D E X

                                    RE      RE    V.
WITNESS         DIRECT   CROSS    DIRECT   CROSS   D.    J
P. Lima         4



                    E X H I B I T S

                                              For   In
PETITIONER              DESCRIPTION           I.D.  Ev.




RESPONDENT              DESCRIPTION           I.D.    IN EV.
```

2              MR. NAZAR KHODOROVSKY:  We are on the

3         record at 11:05 a.m. on Friday, August 27th,

4         2010.  This is the examination pursuant to

5         rule 2004 of the Federal Rules of Bankruptcy

6         Procedure, of the debtor, Pedro Lima, in the

7         case number 10-11809.  The case has been

8         assigned to Judge Robert E. Gerber.  Mr.

9         Lima, good morning, how are you?

10             MR. PEDRO LIMA:  Good morning, well,

11        thank you.

12             MR. KHODOROVSKY:  My name is Nazar

13        Khodorovky, and let me spell that for the

14        record, N-A-Z-A-R K-H-O-D-O-R-O-V-S-K-Y.  I

15        am a trial attorney with the Office of the

16        United States Trustee.  With me, is my

17        colleague, Savitri Nguyen, who is a paralegal

18        with this office.  Savitri, could you just

19        spell your first name and last name, for the

20        record?

21             MS. SAVITRI NGUYEN:  S-A-V-I-T-R-I N-G-

22        U-Y-E-N.

23             MR. KHODOROVSKY:  Thank you so much.

24        Mr. Lima, at this time I will administer the

25        oaths to you.  Mr. Lima, please raise your

2        right hand.  Mr. Lima, do you swear or affirm

3        that the testimony you are about to give, at

4        this examination, pursuant to Rule 2004 of

5        the Federal Rules of Bankruptcy Procedure,

6        will be the whole truth and nothing but the

7        truth?

8            MR. LIMA:  Yes.

9            MR. KHODOROVSKY:  You may lower your

10       right hand.  Mr. Lima, are you represented by

11       an attorney this morning?

12           MR. LIMA:  Yes.

13           MR. KHODOROVSKY:  Counsel, please

14       identify yourself and note your appearance.

15           MR. DAVID HAMILTON:  My name is David

16       Hamilton, from the Law Firm of Dwyer and

17       Associates, admitted to practice in the

18       Southern District.

19           MR. KHODOROVSKY:  Mr. Hamilton, just for

20       the record, would you just spell your first

21       name and last name?

22           MR. HAMILTON:  D-A-V-I-D H-A-M-I-L-T-O-

23       N.

24           MR. KHODOROVSKY:  Thank you so much, Mr.

25       Hamilton.  Now, Mr. Hamilton, as we

discussed, before we went on the record,

before we begin, would you agree on the

record to the following stipulations?  One,

would you agree that the Office of the United

States Trustee provided timely and proper

notice of this examination to you and to Mr.

Lima?

MR. HAMILTON:  I do.

MR. KHODOROVSKY:  Thank you.  And two,

would you also agree to the stipulation that

all objections, except as to the form of the

question, shall be reserved until the time of

trial, if there is one?

MR. HAMILTON:  Yes.

MR. KHODOROVSKY:  Thank you so much.

Now, Mr. Lima, I'll just go over some of the

instructions that I discussed with you before

we went on the record.  First, when answering

questions, please speak up as loud and as

clear as you can, and say yes or no, so the

machine can record your answers when I am

asking you a yes or no question.  Also,

please wait for me to finish the question

before you answer.  If you do not understand

2          a question, please let me know, and I will

3          try to repeat or rephrase it.  Do you

4          understand these instructions?

5               MR. LIMA:  Yes.

6               MR. KHODOROVSKY:  Thank you.  Okay.  So,

7          let me first ask you, Mr. Lima, in your own

8          words, could you tell me why did you decide

9          to file for bankruptcy?

10              MR. LIMA:  I decided to file for

11         bankruptcy because I had an enormous amount

12         of debt, and I had essentially no business,

13         due to a number of factors, and it did not

14         make sense for me to continue to try and run

15         those businesses, which was the only way of

16         paying back those debts.  Because I also

17         have--I am also an educator; I teach.  So, I

18         had enough to sustain me as a person, but the

19         businesses just, it no longer was something

20         that I could handle any more.

21              MR. KHODOROVSKY:  All right.  So, let me

22         ask you this.  You mentioned you are an

23         educator.  So, are you currently employed?

24              MR. LIMA:  Yes.

25              MR. KHODOROVSKY:  Where do you work?

MR. LIMA:  I work for the Art Institute
of New York City.  I am a full time, tenured
professor of interior design.  I also work
for Westwood College, which is an online
school in Denver, Colorado.  So, I teach
online, various courses.  I am an adjunct
faculty.  And I also teach online for the Art
Institute of Pittsburg, online, which is also
another online school, adjunct faculty, as
well, in interior design.

MR. KHODOROVSKY:  And the subjects you
teach are interior design?

MR. LIMA:  Yes.

MR. KHODOROVSKY:  Let me ask you this,
at the Art Institute of New York, let's just
focus on that, when did you become tenured?

MR. LIMA:  September of 2006.

MR. KHODOROVSKY:  Okay, let's--let's
switch gears a little bit and I want to ask
you this.  With regards to your employment
right now, as we sit here today, from all
these educational positions, Westwood
College, the Art Institute of Pittsburgh, Art
Institute of New York, how much do you earn?

2                MR. LIMA:  I can essentially go off of

3            what I earned last year, which was

4            $85,000.00, or $87,500.00.

5                MR. KHODOROVSKY:  Eighty-seven, five

6            hundred?

7                MR. LIMA:  Eighty-seven thousand, five

8            hundred dollars.  And I--I would project this

9            year to earn more, in the range of

10           $100,000.00, based on enrollment and things

11           like that.

12               MR. KHODOROVSKY:  So,--so, what your

13           employers pay you is a function of the--how

14           many people sign up for your classes?

15               MR. LIMA:  It's a function of how many

16           classes they assign me, which is relative to

17           the--the enrollment.  Essentially, the Art

18           Institute of New York City, where I teach on

19           ground, is--it's a position that, unless the

20           school goes away, is very secure.  Whereas

21           the two online universities, it is very

22           possible that I may not have courses at

23           various times, in the--in the year.  So, it's

24           not a job that I can assume I am going to

25           have that income.

1

2          MR. KHODOROVSKY:  Let's just break it

3     down a little bit.  Let's--you said you

4     earned about $87,500.00 in 2009.  So, in

5     2009, you were still employed, at those three

6     same schools:  Art Institute of Pittsburgh,

7     Westwood College, and Art Institute of New

8     York?

9          MR. LIMA:  No.  I began working for the

10    Art Institute online in; I think it was in

11    February of 2010.

12         MR. KHODOROVSKY:  Okay.

13         MR. LIMA:  Let me restate that.  I began

14    receiving paychecks in February of 2010, but

15    my employment actually began in January of

16    2010.

17         MR. KHODOROVSKY:  But, in--so, I could

18    be correct in saying that in 2009, you were

19    working for the Art Institute of New York and

20    Westwood College?

21         MR. LIMA:  Yes.

22         MR. KHODOROVSKY:  At the same positions

23    as you have mentioned before?

24         MR. LIMA:  Yes.

25         MR. KHODOROVSKY:  And you earned, like

1

2          you said, a total of about $87,500.00;

3          eighty-seven thousand, five hundred?

4              MR. LIMA:  Yes.

5              MR. KHODOROVSKY:  In 2008, were you

6          employed?

7              MR. LIMA:  Yes.

8              MR. KHODOROVSKY:  And so you were also

9          employed in 2008, at the Art Institute of New

10         York?

11             MR. LIMA:  Yes.

12             MR. KHODOROVSKY:  And where else were

13         you employed in 2008?

14             MR. LIMA:  Westwood College online.

15             MR. KHODOROVSKY:  At the same positions?

16             MR. LIMA:  Yes.

17             MR. KHODOROVSKY:  And how much did you

18         earn in--in 2008?

19             MR. LIMA:  I believe I earned, in the--

20         in the range of $90,000.00 to $100,000.00.  I

21         am almost positive it was $95,000.00.

22         Because--can I state why that is?

23             MR. KHODOROVSKY:  Go ahead.  Definitely.

24         Definitely.

25             MR. LIMA:  Because--

2        MR. KHODOROVSKY: (Interposing) Take

3        your time.

4        MR. LIMA:  -I had more classes in 2008.

5        As the economy began to go down, obviously,

6        interior design is a heavily influenced

7        industry, based on economy, and enrollment

8        went down, so in 2009, I had no way of

9        knowing that I would make less, as an

10       educator.  But I did.  And this year, as

11       well.  That's why I said I--I'm not sure

12       exactly how much I'm going to make, but I

13       realize the question was what I did make.

14       So, I'm just saying.

15       MR. KHODOROVSKY:  Okay.  And finally,

16       let's just look back a little bit.  In 2007,

17       where did you work in 2007?

18       MR. LIMA:  The same places.

19       MR. KHODOROVSKY:  Art Institute of New

20       York and Westwood?

21       MR. LIMA:  Yes.

22       MR. KHODOROVSKY:  At the same positions?

23       MR. LIMA:  Yes.

24       MR. KHODOROVSKY:  And how much did you

25       earn in 2007?

MR. LIMA:  2007, I earned roughly

$110,000.00.

MR. KHODOROVSKY:  That's fine.  Now, I

think I'm going to go forward a little bit.

So, in 2007, in addition to working for these

employers, did you get any additional income,

beyond that?

MR. LIMA:  In 2007, I did, yes.

MR. KHODOROVSKY:  And--and how much?

Well, actually let's start it this way.  How

did you get this additional income?

MR. LIMA:  Through my own personal

businesses.

MR. KHODOROVSKY:  And what businesses

were those?

MR. LIMA:  In 2007, I had an interior

design business.

MR. KHODOROVSKY:  Did it have a name?

MR. LIMA:  Yes, it was Pedro Lima

Design, LLC.

MR. KHODOROVSKY:  Mm hmm.

MR. LIMA:  And I believe I earned no

more than $15,000.00; $15,000.00 to

$20,000.00 I'm going to say, conservatively--

well, actually that's a little--it was--it

was not more than $15,000.00, from my own

personal business.

                MR. KHODOROVSKY:  From Pedro Lima

Design?

                MR. LIMA:  Correct, yes.

                MR. KHODOROVSKY:  Did you have any other

businesses in 2007, other than Pedro Lima

Design?

                MR. LIMA:  No.

                MR. KHODOROVSKY:  Let's go forward a

little bit.  So, in 2008, did you have any

income, in addition to work?  To working for

Art Institute and Westwood?

                MR. LIMA:  Yes.

                MR. KHODOROVSKY:  And how much

additional income did you have, beyond work?

                MR. LIMA:  I--I have--honestly, I have a

very hard time recalling these figures,

because of the complexity of all of these--of

the case.  The years is difficult for me to

distinguish.  I realize this is all in the

paperwork, so--

                MR. KHODOROVSKY:  (Interposing) I

1

2          understand--

3               MR. LIMA:  -I keep referring to my--

4               MR. KHODOROVSKY:  (Interposing) No, I

5          understand what you're saying.  Let's--let's-

6          -let's go on a little bit.  But let me sort

7          of make--ask a more general question.  And I

8          understand what you are saying.  But you did

9          have additional income, other than

10         employment, right?

11              MR. LIMA:  Does--can I ask a question?

12         When you say that?  With my own--are you

13         referring to employment of myself or

14         employment from other people?  Because I had-

15         -if you say employment, I don't know if you

16         are referring to my businesses, as well.

17              MR. KHODOROVSKY:  Well let me make it--

18         let me make this a very simple question then.

19         Let me get a lot simpler.  Beyond your work,

20         in 2008, for Art Institute of New York and

21         the Westwood College, did you have any other

22         income beyond that employment?

23              MR. LIMA:  I would have to look at my

24         tax statements, because there were various

25         years where I did not receive income from my

personal businesses.  In fact, there were

years that I had to support my businesses

because I made a nice living teaching.  The

teaching positions allowed me to practice

interior design, which is extremely important

and was worth it to me, because being an

educator, it is essential to also be a

practitioner.  So, that's why I'm a little--I

just am having a hard time distinguishing

what--remembering what was a personal income

versus those other incomes.

        MR. KHODOROVSKY:  Okay.  So, let me ask

you this, in 2008, though, let me make it

even simpler.  Pedro Lima Design, was it in

operation in 2008?

        MR. LIMA:  Yes.

        MR. KHODOROVSKY:  And did the company do

any work in 2008?

        MR. LIMA:  Yes.

        MR. KHODOROVSKY:  Did it get paid for

that work?

        MR. LIMA:  Yes.

        MR. KHODOROVSKY:  Okay.  So, let's move

forward into 2009.  Let me ask you this,

2          other than working for Art Institute of New

3          York and the Westwood College, did you have

4          any other income?

5               MR. LIMA:  Yes.

6               MR. KHODOROVSKY:  And from where?

7               MR. LIMA:  From two of my personal

8          businesses.

9               MR. KHODOROVSKY:  Which businesses are

10         those?

11              MR. LIMA:  Pedro Lima Design, LLC.

12              MR. KHODOROVSKY:  Mm hmm.

13              MR. LIMA:  And another business, which I

14         started early 2009, called New York Urban

15         Stone, Inc.

16              MR. KHODOROVSKY:  And can you just tell

17         me briefly what is the difference between

18         those two companies?

19              MR. LIMA:  Pedro Lima Design is an

20         interior design firm.  So, essentially an

21         interior design firm makes money on fees, as

22         well as commissions on sales for product,

23         which is often billed through the company.

24              MR. KHODOROVSKY:  And so what did Urban

25         Stone do?

1

2          MR. LIMA:  New York Urban Stone was a

3     retail company, and the main product was

4     stone--various types of stone.

5          MR. KHODOROVSKY:  Like masonry or

6     decorative stones?

7          MR. LIMA:  Decorative stone.

8          MR. KHODOROVSKY:  Like something people

9     would put in their apartments or houses,

10    rather than something they would use for a

11    fence?

12         MR. LIMA:  Yes, it was--essentially--

13    counter tops, slabs and tiles, mosaics,

14    liners, trims, all sorts of materials for

15    interiors.

16         MR. KHODOROVSKY:  And you would buy the

17    product and you would sell it to clients?

18         MR. LIMA:  Yes.

19         MR. KHODOROVSKY:  Okay.  So, from those

20    two businesses, if you can recall, how much

21    income did you have in 2009?

22         MR. LIMA:  I don't think I made any

23    money in 2009, on those businesses.

24    Actually, I think I lost money on those

25    businesses, which I know sounds strange,

1

2      maybe, but--.

3             MR. KHODOROVSKY:  Okay.  So, let's--

4      let's--let me ask you right now, are you

5      making any additional income outside of

6      teaching?

7             MR. LIMA:  I do melaleuka.  I make about

8      $10.00 a month.

9             MR. KHODOROVSKY:  I'm sorry; you do

10     what?

11            MR. LIMA:  Melaleuka, is like--

12            MR. KHODOROVSKY:  Can you spell that for

13     me?  I apologize, - - .

14            MR. LIMA:  Certainly.  M-E-L-A-L-E-U-K-

15     A, which is a multi-level marketing company.

16     I make five dollars a month.  But--so, I--

17     that's the only other additional income and I

18     just want to be thorough, in terms of

19     answering your questions.

20            MR. KHODOROVSKY:  Okay.  And you are

21     part of their sales network now?

22            MR. LIMA:  Yeah, right.  Yes.

23            MR. KHODOROVSKY:  I'm sorry; let me ask

24     you--I apologize; what is this product?  I've

25     never heard of it; I apologize.

1

2          MR. LIMA:  Melaleuka would be on par to

3      Amway or Shackle or Herbalife.

4          MR. KHODOROVSKY:  No, but what products

5      do you sell?  What I'm trying to understand

6      is not what the company is, but what is the

7      product?

8          MR. LIMA:  The products--actually I

9      don't sell them.  Essentially when--when I

10      enroll--I have to enroll somebody to buy from

11      that company.

12          MR. KHODOROVSKY:  Oh. Oh, it's something

13      like that?

14          MR. LIMA:  It's like a little commission

15      that they always--they give.

16          MR. KHODOROVSKY:  So, you get

17      commissions from enrolling other agents?

18          MR. LIMA:  Yeah, rather than, you know

19      selling them--and the products would be

20      things like; they have four collections, like

21      cleaners--like home cleaning products,

22      personal hygiene, and they have some food

23      products--specialty foods, as well as a

24      vitamin line.

25          MR. KHODOROVSKY:  Okay.  Let me ask you

2        this.  No, let's actually talk a little bit

3        about Pedro Lima Design and New York Urban

4        Stone, Inc.  Are those companies currently

5        active?

6            MR. LIMA:  No.

7            MR. KHODOROVSKY:  When did they stop

8        being active?  Well, sorry; let me rephrase.

9        When did Pedro Lima Design stop being active?

10           MR. LIMA:  Pedro Lima Design was

11       discharged as a company uh roughly, it was in

12       the fall of 2009, but I did--I stopped--I was

13       closing down shop.  I wasn't taking any new

14       business, just--just working out my projects.

15       I believe it was around March, April, maybe

16       May of 2009, is when I started to realize I

17       was not going to be able to keep that

18       company.  And New York Urban Stone--

19           MR. KHODOROVSKY:  (Interposing) Well,

20       I'm sorry.  I apologize for interrupting you.

21       You said it was a discharged company.  Do you

22       mean you dissolved it completely?

23           MR. LIMA:  I'm sorry; yeah--yeah, what

24       am I saying?  Yes.

25           MR. KHODOROVSKY:  No, that's fine.

1

2          MR. LIMA:  I'm sorry.  Yeah, I--the

3     company, I dissolved the company.

4          MR. KHODOROVSKY:  And New York Urban

5     Stone--you were starting to say.  I

6     apologize.

7          MR. LIMA:  New York Urban Stone was a

8     little bit more complicated.  I--I am in the

9     process of dissolving the company, but it

10    had--the state actually made a number of

11    mistakes on the sales tax, for that company.

12    So, it has taken well over six months, for

13    the state to correct those sales tax

14    problems.  And--but it is almost dissolved.

15    But I haven't done any business with New York

16    Urban--or that company did no business after

17    August or September of 2009.

18         MR. KHODOROVSKY:  Okay.  Let me ask you

19    this.  Were both of these companies, Pedro

20    Lima Design, were you the only shareholder?

21         MR. LIMA:  Yes.

22         MR. KHODOROVSKY:  And New York Urban

23    Stone, are there any other shareholders

24    beside you?

25         MR. LIMA:  No.

1

2          MR. KHODOROVSKY:  Now, currently, Mr.

3      Lima, as we are sitting here today, besides

4      those two companies that you mentioned, are

5      you an officer or director of any other

6      companies?

7          MR. LIMA:  No.

8          MR. KHODOROVSKY:  Let me rephrase the

9      question a little bit.  As we sit here today,

10     are you an officer or director of any not for

11     profit organizations?

12         MR. LIMA:  Yes.

13         MR. KHODOROVSKY:  Which organizations?

14         MR. LIMA:  The American Society of

15     Interior Designers.  New York--

16         MR. KHODOROVSKY:  (Interposing) Okay.

17         MR. LIMA:  I'm sorry.

18         MR. KHODOROVSKY:  Go ahead.

19         MR. LIMA:  New York Metro Chapter.

20         MR. KHODOROVSKY:  And what position do

21     you hold?

22         MR. LIMA:  I am the President.

23         MR. KHODOROVSKY:  And as the President,

24     what do you do?

25         MR. LIMA:  I essentially manage and run

2    a--the chapter, which is the New York area

3    and there are roughly 2,000 members.  So,

4    it's a volunteer position, and I am charged

5    with the responsibility of the association

6    effectively helping the members to maintain

7    their businesses and make money and develop

8    themselves professionally, and also advance

9    the profession of interior design through

10   legislation.

11        MR. KHODOROVSKY:  You mean advocacy,

12   essentially?

13        MR. LIMA:  Correct.  Although that is

14   not the primary goal of the association.

15        MR. KHODOROVSKY:  Okay.  And you said

16   it's a volunteer position, so you don't have

17   any salary?

18        MR. LIMA:  Correct, no salary.

19        MR. KHODOROVSKY:  And when did you start

20   at this position?

21        MR. LIMA:  October of 2009, and the year

22   prior, October of 2008 to--through October--

23   through September of 2009, I was the

24   President-Elect.  So, it was essentially like

25   a vice president's position.

1

2      MR. KHODOROVSKY:  Mm hmm.

3      MR. LIMA:  So that was a support to the

4      president.  So, I've been on the Board of

5      Directors for two years--roughly two years.

6      It will be two years next month, in September

7      of 2010.

8      MR. KHODOROVSKY:  Mm hmm.  And as the

9      vice--as this President-Elect, or like, you

10     said almost a vice president, did that have

11     any compensation?

12     MR. LIMA:  No.  I have never received

13     any compensation from my volunteer work

14     there.

15     MR. KHODOROVSKY:  Well, - -

16     compensation, do you--do you, as part of your

17     position, do you organize any events?

18     MR. LIMA:  I do.

19     MR. KHODOROVSKY:  And when you organize

20     events, do you get any expenses reimbursed?

21     MR. LIMA:  Yes.

22     MR. KHODOROVSKY:  So you do get expense

23     reimbursements?

24     MR. LIMA:  Yes.

25     MR. KHODOROVSKY:  Well, let me ask you

2          this.  Let me--I'm sorry; let me ask you a

3          somewhat different question.  You said you

4          started being the President of--of this

5          Association of Interior Designers, New York

6          Metro Chapter, in October 2009.  Is there any

7          termination date for your term as President?

8                MR. LIMA:  September 31st, 2010.

9                MR. KHODOROVSKY:  And is there another

10         President-Elect who is scheduled to replace

11         you?

12               MR. LIMA:  Yes.

13               MR. KHODOROVSKY:  And I guess, to get to

14         this position, or--do you have to have any

15         professional licenses?

16               MR. LIMA:  Yes.

17               MR. KHODOROVSKY:  Do you have any

18         professional licenses?

19               MR. LIMA:  Yes.  I'm sorry; yes.

20               MR. KHODOROVSKY:  And which ones do you

21         have?

22               MR. LIMA:  I have a--I am a Certified

23         Interior Designer in New York State.  I am

24         NCIDQ Certified, and--

25               MR. KHODOROVSKY:  (Interposing) I'm

sorry; can you--I apologize.

MR. LIMA:  Sure.  Sure.

MR. KHODOROVSKY:  Could I get you to
explain that?

MR. LIMA:  N-C-I-D-Q, is stands for the
National Council for Interior Design
Qualifications--or of Interior Design
Qualifications, which is a--it's a
standardized test that designers can take, in
order to become certified by NCIDQ.  So, it's
comparable to an architect passing the bar.
The bar?  Is that the--whatever their test
is.

MR. KHODOROVSKY:  No, I understand.  Let
me ask you--let me ask you this question.
And those two licenses that you mentioned,
are they in good standing?

MR. LIMA:  Yes.

MR. KHODOROVSKY:  Okay.  And do you have
to get, as part of those licenses, do you
have to get them recertified--

MR. LIMA:  (Interposing) Yes.

MR. KHODOROVSKY:  -after a certain
period of time?

1

2              MR. LIMA:  Yes.

3              MR. KHODOROVSKY:  And when do you have

4         to get those two recertified?

5              MR. LIMA:  Every year I renew those--I

6         renew the certification with New York State,

7         and pay a fee.  And for NCIDQ, I also renew

8         my membership, because once you are

9         certified, it is for life.  But in order to--

10        but you can also be a member of the

11        association.

12             MR. KHODOROVSKY:  And you renew your

13        membership--how often do you renew it?

14             MR. LIMA:  Yearly.

15             MR. KHODOROVSKY:  Okay.  Now, actually,

16        I have to switch subjects and go back a

17        little bit.  Now, you said you organized

18        events for ASID and you get expense

19        reimbursements.  Right?

20             MR. LIMA:  Yes.

21             MR. KHODOROVSKY:  Okay.  How--how much

22        did you get in expense reimbursements in--in

23        2009?  Well, let me ask you this question.

24        Do you remember the figure or if you don't,

25        just say you don't remember.

1

2          MR. LIMA:  Is an approximate figure

3     okay?

4          MR. KHODOROVSKY:  That will be fine.

5          MR. LIMA:  Okay.  Roughly around

6     $1,000.00, in 2009.

7          MR. KHODOROVSKY:  What about this year?

8          MR. LIMA:  This year, expenses in the

9     range of $5,000.00.  Wait--

10          MR. KHODOROVSKY:  (Interposing) To date,

11     as we sit here today?

12          MR. LIMA:  Maybe $2,500.00.  I'm sorry;

13     there are some--there was a trip, so--so that

14     was the bulk of the money and then there's

15     charitable donations that I am expected to

16     make that the Chapter does reimburse me for.

17     So, essentially the Chapter is making those

18     donations, but I--I'm supposed to pay for

19     those.  Things like that.

20          MR. KHODOROVSKY:  Mm hmm.  So, you said

21     the--but you get--you've gotten about

22     $2,500.00 in reimbursements this year?

23          MR. LIMA:  Yes.

24          MR. KHODOROVSKY:  As we sit here today?

25          MR. LIMA:  Yes.

2              MR. KHODOROVSKY:  And did you get any

3         reimbursements for expenses when you were

4         President-Elect?

5              MR. LIMA:  Yes.

6              MR. KHODOROVSKY:  So, the $1,000.00 that

7         you got, in 2009, that covers your time as

8         President and as President Elect?

9              MR. LIMA:  Yes.

10             MR. KHODOROVSKY:  Now, let me ask you

11        this question.  For the American Society of

12        Interior Designers, the New York Chapter,

13        sorry; I take that back.  For--for Urban

14        Stone, Inc.--New York Urban Stone, does that

15        company still have a bank account?

16             MR. LIMA:  No.

17             MR. KHODOROVSKY:  Does Pedro Lima Design

18        still have a bank account?

19             MR. LIMA:  No.

20             MR. KHODOROVSKY:  And when were those

21        closed?

22             MR. LIMA:  Those were actually closed at

23        the same time, in the fall of 2009.  I want

24        to say September, late September of 2009.

25        I'm trying to remember the weather, when I

1

2      went in.

3              MR. KHODOROVSKY:  That's fine,

4      absolutely fine.  Now, talking about bank

5      accounts, for American Society of Interior

6      Designers, New York Chapter, who has the

7      signatory authority on that organization's

8      bank account?

9              MR. LIMA:  I do.

10             MR. KHODOROVSKY:  And who, when the

11     organization files its tax returns, who would

12     sign the tax return?

13             MR. LIMA:  I sign them.

14             MR. KHODOROVSKY:  Has--let me ask you

15     this question.  Has American Society of

16     Interior Designers, New York City Chapter,

17     filed its 2009 return?

18             MR. LIMA:  Yes.

19             MR. KHODOROVSKY:  Council, I--would it

20     be possible for me to request, from you, if

21     Mr. Lima can provide to you and then to my

22     office, a copy of that return?

23             MR. HAMILTON:  Sure, to the extent it is

24     possible.

25             MR. KHODOROVSKY:  Those--those are

2          documents that are actually public.  If it's

3          a--if it's a registered 501(c)3 charity,

4          those should be public.

5               MR. LIMA:  It's a not for profit.

6               MR. KHODOROVSKY:  No, the reason I'm

7          saying this, is I actually have in my

8          possession, a 2007 tax return, I guess signed

9          by one of your predecessors, American Society

10         of Interior Designers--

11              MR. LIMA:  (Interposing) One of my--you

12         mean a former Chapter President?

13              MR. KHODOROVSKY:  Yes.  I think--I

14         think--let me just see if you can recognize

15         who--who this signatory is.  Yeah, a

16         gentleman named John Buskarello.

17              MR. LIMA:  John Buskarello was the

18         Financial Director.

19              MR. KHODOROVSKY:  He was the Financial

20         Director?

21              MR. LIMA:  Right.

22              MR. KHODOROVSKY:  Okay.  Yeah, so--so

23         those--some of these are public.  I can get

24         them from the internet.

25              MR. LIMA:  I understand.

1

2          MR. KHODOROVSKY:  Because it's a public

3    document for the not for profit organization.

4    So, if possible, because I haven't been able

5    to find the 2009 return.  If I could get a

6    copy of the 2009 return I would appreciate

7    it.

8          MR. LIMA:  Okay.

9          MR. KHODOROVSKY:  Would that be

10   possible?

11         MR. LIMA:  Yes, that would be possible.

12         MR. KHODOROVSKY:  Thank you so much.

13         MR. LIMA:  May I ask why this is

14   important, because I am going to be asked by

15   my Chapter why my personal finances--

16         MR. KHODOROVSKY:  (Interposing)

17   Absolutely.  I can--I can definitely explain

18   to you why our office would need this

19   document.  We would like to review, and

20   understand, and confirm your testimony

21   today,--

22         MR. LIMA:  (Interposing) Mm hmm.

23         MR. KHODOROVSKY:  -regarding

24   compensation, reimbursement of expenses,

25   things like that.  This would be a perfect

1

2          document.

3                   MR. LIMA:  Okay.

4                   MR. KHODOROVSKY:  In fact, if anything,

5          the reason--I'll show you--I'll show you how

6          this form is structured, the Form 990 that is

7          from 2007, that I think is from one of your

8          predecessors--that Mr. Buskarello signed,

9          there is a--there is a portion there that--

10         that talks about, you know officers and

11         directors and their compensation.  And that's

12         why we would need this document.  Because it

13         will confirm your testimony.

14                  MR. LIMA:  Okay, great.

15                  MR. KHODOROVSKY:  It's just very, very

16         helpful.

17                  MR. LIMA:  Great, okay.

18                  MR. KHODOROVSKY:  Thank you so much.

19         Let me just ask you a couple of brief

20         questions, then we'll go into your Petition

21         Schedules.  Mr. Lima, are you currently

22         married?

23                  MR. LIMA:  No.

24                  MR. KHODOROVSKY:  Have you ever been

25         divorced?

1

2          MR. LIMA:  No.

3          MR. KHODOROVSKY:  Okay.  Let's--let's

4     turn to your schedules.  I have given you and

5     your counsel a copy of your schedules.  So,

6     let's turn to your Schedule J, as in James.

7     I want to ask you a couple of questions about

8     your expenses.  And if you can't find it,

9     counsel, Mr. Hamilton should be able to help

10    you.

11         MR. LIMA:  I found it, thank you.

12         MR. HAMILTON:   - - .

13         MR. KHODOROVSKY:  So, Mr. Lima, let's

14    turn to your Schedule J, of the schedules you

15    had filed with the court.  Mr. Lima, are you

16    familiar with the information contained in

17    your Schedule J?

18         MR. LIMA:  Yes.

19         MR. KHODOROVSKY:  And is it true and

20    accurate to the best of your knowledge?

21         MR. LIMA:  Yes.

22         MR. KHODOROVSKY:  Mr. Lima, as we sit

23    here today, right now, would you like to make

24    any changes to that information?

25         MR. LIMA:  No.

2          MR. KHODOROVSKY:  Okay.  - - , starting

3     with the beginning.  Are you up to date with

4     your rent payments, after filing bankruptcy?

5          MR. LIMA:  Yes.

6          MR. KHODOROVSKY:  Okay.  Let's--let's

7     look down a little bit.  Do you see there, at

8     line 2c, for telephone expenses, $170.00 a

9     month.

10          MR. LIMA:  Yes.

11          MR. KHODOROVSKY:  What does that cover?

12          MR. LIMA:  I know, I'm trying to make

13     sure I read across the lines properly.  The--

14          MR. KHODOROVSKY:  If you need a straight

15     edge, I can give you my folder.

16          MR. LIMA:  The telephone covers the

17     landline.  I believe it was for my apartment

18     and for my office, which I paid out of my

19     personal funds.

20          MR. KHODOROVSKY:  And where is your

21     office, by the way?

22          MR. LIMA:  11 West 25th Street.

23          MR. KHODOROVSKY:  In the City?

24          MR. LIMA:  Yes, in New York City, yes.

25     I don't pay any rent any more.

1

2          MR. KHODOROVSKY:  So, when did you stop

3     paying rent for your office?

4          MR. LIMA:  About two months ago.

5          MR. KHODOROVSKY:  After you filed for

6     bankruptcy?

7          MR. LIMA:  Correct, yes.  They took pity

8     on me.  Essentially, I use the address.  I

9     don't actually work, very often, from there.

10    That was one of the things that I needed to

11    change after my bankruptcy, so that I could

12    adjust my life.

13         MR. KHODOROVSKY:  Now you said this

14    $170.00 covers the landline for the apartment

15    and the office.

16         MR. LIMA:  Yes.

17         MR. KHODOROVSKY:  Do you have a cell

18    phone?

19         MR. LIMA:  I do.

20         MR. KHODOROVSKY:  And what did you--did

21    you list your cell phone expenses--

22         MR. LIMA:  (Interposing) Can I ask a

23    question?  I can't remember, does that

24    telephone--is there a cell phone line item on

25    this?

1

2          MR. KHODOROVSKY:  I think you may need

3      to address the question to your counsel.

4          MR. LIMA:  Is there a cell phone line

5      item on this?

6          MR. HAMILTON:  I believe that's for

7      everything.

8          MR. LIMA:  I think--okay, then may I--

9      may I say that that would be my cell phone--

10     this would make a lot more sense.  Okay.

11     That would be my cell phone, as well as my

12     landline, and my office line.

13         MR. KHODOROVSKY:  So, the $170.00 a

14     month, just so I understand it, I'm going to

15     repeat what I understand you are saying.  If

16     I am incorrect, correct me.  So, the $170.00

17     a month covers your landline for your

18     apartment, your office, and your cell?

19         MR. LIMA:  Correct.

20         MR. KHODOROVSKY:  Now, regarding your

21     phone expenses, well--are any of your phone

22     expenses reimbursed by anybody else?

23         MR. LIMA:  No.

24         MR. KHODOROVSKY:  Does--does the

25     American Society of Interior Designers

2          reimburse any cell phone expenses for you?

3               MR. LIMA:  No.

4               MR. KHODOROVSKY:  And no landline phone

5          expenses either?

6               MR. LIMA:  No.  No expenses other than

7          charitable donations, or related trips for

8          training.  Or--or on occasion, there will be

9          an event where I need to pay for a ticket.

10         Those are the only types of reimbursements

11         that are permitted.

12              MR. KHODOROVSKY:  Now, let's--let's go

13         down the line.  Now, you see there, line

14         2(d), cable TV and internet, $170.00 a month?

15         Do you see that?

16              MR. LIMA:  Yes.

17              MR. KHODOROVSKY:  Okay.  As--does

18         American Society of Interior Designers have

19         an office?

20              MR. LIMA:  Yes--no, we don't.  We don't.

21              MR. KHODOROVSKY:  Let me ask you this

22         then.  If you look at the 2007 return, and if

23         you don't know you don't know.  But there is

24         an address there for Dynamic Management

25         Services, 551 Fifth Avenue, Room 3010, New

1

2          York, New York.

3                    MR. LIMA:  Yes.

4                    MR. KHODOROVSKY:  Is that an office that

5          the organization uses or--?

6                    MR. LIMA:  That is--that is the office

7          of our management company.

8                    MR. KHODOROVSKY:  Can you explain that?

9                    MR. LIMA:  I apologize.  As a--as an

10         association, we don't have a physical

11         location in the New York Metro Chapter, which

12         is somewhat unusual, for--for ASID, because

13         expenses in New York, and just a number of

14         reasons.  So, we--we have a management

15         company, every month, on retainer, that does

16         all of the administrative work for the

17         chapter.  And we pay a fee to them, and then

18         their expenses are essentially unknown to us,

19         really, but.

20                   MR. KHODOROVSKY:  But--but that would be

21         the address--well, let's say somebody wants--

22         if somebody wants to send mail--

23                   MR. LIMA:  (Interposing) Yes.

24                   MR. KHODOROVSKY:  I apologize, please

25         let me finish.

2              MR. LIMA:  I'm sorry.  I'm sorry.

3              MR. KHODOROVSKY:  So, if somebody wants

4         to send mail, to the American Society of

5         Interior Designers, they would write to

6         Dynamic Management Services, 551 Fifth

7         Avenue, etcetera?

8              MR. LIMA:  Yes.  They would--they would

9         write American Society of Interior Designers,

10        and then put that address on there.

11             MR. KHODOROVSKY:  Mm hmm.

12             MR. LIMA:  But, I think technically it

13        is Dynamic Management's address, but they let

14        us use that address.  They don't have--they

15        wouldn't have to do that.  We could have a

16        P.O. Box.

17             MR. KHODOROVSKY:  But does--does ASID

18        currently have a P.O. Box?

19             MR. LIMA:  No, we don't.

20             MR. KHODOROVSKY:  So, you use that

21        address, the 551 Fifth Avenue?

22             MR. LIMA:  Yes, we do.  We do use that

23        address, yes.

24             MR. KHODOROVSKY:  Okay.  And there's--is

25        there any equipment there - -location that

2          you could use for yourself or for ASID?

3                MR. LIMA:  No.

4                MR. KHODOROVSKY:  Let's stay on the same

5          page but let's change the subject a little

6          bit.  Let's go down to line 8,

7          transportation, not including car payments,

8          $200.00 a month.  Is that correct?

9                MR. LIMA:  Yes.

10               MR. KHODOROVSKY:  Can you explain to me

11         what--what this is for?

12               MR. LIMA:  That would be for my subway

13         card, which is, I think it was $85.00, or

14         $89.00 this year--I mean a month; I'm sorry;

15         they changed it.  And then the additional

16         funds would be for--for a zip car, because I

17         would need to, on occasion, for--for my

18         businesses, would need to travel to various

19         clients.  And again, last year I was mostly

20         wrapping up projects, because I was closing

21         the business.  So, I didn't have the--because

22         those would be a lot more money, if I was

23         doing a lot of transportation.  But, I wanted

24         to be really thorough, and so I sort of--what

25         I did was I just averaged out the year and

2          that would be--that was the average.  And

3          there are a few taxi cabs that I also looked

4          at and I included it in there probably about

5          one or two a month.

6              MR. HAMILTON:  Just to clarify, this

7          should be current.

8              MR. LIMA:  This is not current.

9              MR. KHODOROVSKY:  So, basically, just--

10         just--actually, let me rephrase it.  So, as

11         we sit here today, do you use the zip car

12         anymore?

13             MR. LIMA:  No.

14             MR. KHODOROVSKY:  And how much--how much

15         would you say you are saving per month, by

16         not using a zip car?

17             MR. LIMA:  About $100.00.

18             MR. KHODOROVSKY:  And those

19         transportation expenses, any of that portion

20         gets reimbursed by anybody, or by ASID?

21             MR. LIMA:  No, never.  Oh, the taxi

22         cabs, yes.

23             MR. KHODOROVSKY:  So the ASID reimburses

24         your taxi cabs?

25             MR. LIMA:  Yes, uh huh, when I submit.

I don't--only if it is related and it's a

situation where I needed to take a cab,

because I was late or something really

serious like that.  We are not encouraged to

do that though.

MR. KHODOROVSKY:  I understand.  And

what about your subway card, does--does ASID

reimburse any portion of your subway card?

MR. LIMA:  No.

MR. KHODOROVSKY:  Let's actually--can

you turn to the other page; it's the other

expenses on line 17?

MR. LIMA:  Okay.

MR. KHODOROVSKY:  Right there.  See that

list of expenses?

MR. LIMA:  Okay, yes.

MR. KHODOROVSKY:  Excellent.  Okay.

Let's look at the next to last line there.

You see where it says gifts, $125.00 per

month?

MR. LIMA:  Yes.

MR. KHODOROVSKY:  Would you say that

figure is correct?

MR. LIMA:  That figure is a little less

2    now.

3         MR. KHODOROVSKY:  So, what would you say

4    it is now?

5         MR. LIMA:  That's--$75.00 a month, on

6    average, would be--would be about right.

7         MR. KHODOROVSKY:  Now,--now that $75.00

8    per month that you're saying, you say gifts.

9    What kind of gifts are these?

10        MR. LIMA:  That would be things like I'm

11   pretty good about birthday cards.  I try to

12   get, you know, really nice cards, because I

13   don't give--I used to give pretty nice gifts.

14   Just I would--you know I'm a designer; I like

15   to find nice things.  But now it's--it's

16   birthday cards, maybe a gift of ten or 15

17   dollars, at the most, even at the holiday

18   season, I don't give--this last year or maybe

19   the year before, I don't remember, but not as

20   much as I usually did when I was making more

21   money.

22        MR. KHODOROVSKY:  I understand.  I

23   understand.  So, let me ask you this.  If you

24   think back, to before you filed for

25   bankruptcy, one year before you filed for

1

2      bankruptcy, did you give any gifts to any

3      person that were over $200.00 in value?

4           MR. LIMA:  No.

5           MR. KHODOROVSKY:  So, throughout 2009,

6      you didn't give a gift to anybody, over

7      $200.00 in value?

8           MR. LIMA:  No.  Maybe--but not much over

9      that.  I just want to be--if I looked at my

10     bank statements, it might be to a boyfriend

11     or something like that.

12          MR. KHODOROVSKY:  We'll get to - - a

13     little later.

14          MR. LIMA:  Okay.

15          MR. KHODOROVSKY:  Okay.  Let me ask this

16     question in a somewhat different fashion.

17     Let's again think back one year before you

18     filed for bankruptcy, did you make any

19     charitable contributions to any organization

20     over $100.00 in value?

21          MR. LIMA:  And is this for--

22          MR. KHODOROVSKY:  (Interposing) April

23     2009 through April 2010, the year before you

24     filed.

25          MR. LIMA:  Yes, I did.  Yes.

2              MR. KHODOROVSKY:  You did?  And who did

3         you give the contributions to?

4              MR. LIMA:  I gave money to an

5         association--to the Education Legacy Fund.

6              MR. KHODOROVSKY:  Can you explain to me

7         what that is?  I apologize.

8              MR. LIMA:  Sure.  That is an association

9         that is affiliated with the ASID New York

10        Metro Chapter, that gives scholarships to any

11        of the five accredited interior design

12        programs in New York City.  There are five

13        CIDA, C-I-D-A, so it's a specific number of

14        schools that they give money.  So, I would--I

15        gave money for that.  I also gave money for

16        the, I think it's called the American Society

17        of Interior Designers Foundation, and that is

18        a national charity.  So, it's not the same

19        thing as the regular ASID.  So, the national

20        foundation, as well, provides scholarship

21        money and they do charitable work.  And what

22        else?  There might have been--

23             MR. KHODOROVSKY:  (Interposing) Take

24        your time.

25             MR. LIMA:  I think that's it.

1

2          MR. KHODOROVSKY:  That's it?  Okay.

3          MR. LIMA:  I think that's it, yeah.

4          MR. KHODOROVSKY:  Okay.  So, let me--

5          MR. LIMA:  (Interposing) Those are the

6     big ones.

7          MR. KHODOROVSKY:  Okay.  Okay.  That's

8     helpful.  Let me ask you this.  The--let's

9     start with the ASID Foundation, how much did

10    you give them during the year before you

11    filed?  In total?

12         MR. LIMA:  Let me clarify, I gave them

13    $250.00.  I was reimbursed for that.  That's

14    what I was referring to with ASID.  So, I was

15    reimbursed for that.  I don't know if that's-

16    -I don't know how that plays in, but I was

17    reimbursed for that.

18         MR. KHODOROVSKY:  For the entire amount?

19         MR. LIMA:  I was reimbursed for the

20    entire amount of all of the charitable

21    organizations that I contributed to.

22         MR. KHODOROVSKY:  So, so all the

23    charitable contributions you made, during the

24    year before filing, all of them were

25    reimbursed?

2          MR. LIMA:  I think so, yes.

3          MR. KHODOROVSKY:  And--and I understand

4     they were reimbursed to you, but so you said

5     you gave ASID about $250.00 in total?

6          MR. LIMA:  It was closer to; I think it

7     was more than that.  What did I put here?

8          MR. KHODOROVSKY:  Well, you put down

9     that you made $125.00 in - - a month.

10         MR. LIMA:  Yeah, because I--yes, because

11    I made a donation for $250.00 to the

12    foundation, and about $200.00 to ELF.

13         MR. KHODOROVSKY:  To the Educational

14    Legacy Fund?

15         MR. LIMA:  Yeah, I'm sorry; to ELF,

16    Educational Legacy Fund.  I can't remember if

17    there were others.  Those are the major ones

18    that I recall though.

19         MR. KHODOROVSKY:  So, at least $500.00

20    in contributions--

21         MR. LIMA:  (Interposing) Yeah.

22         MR. KHODOROVSKY:  -you made during that

23    year?

24         MR. LIMA:  Yes.

25         MR. KHODOROVSKY:  During that time

period?

MR. LIMA: Yes. Yes, at least.

MR. KHODOROVSKY: And that was - - .

MR. LIMA: Oh, you know what? I also gave money to, there's a scholarship fund at my--at the Art Institute of New York City.

MR. KHODOROVSKY: Mm hmm.

MR. LIMA: And I would give money every three months, because I teach one of the portfolio--the graduates, I teach them in their last class. So, I--we have a scholarship and I always give some money to the scholarship--the school scholarship, which I pay for; it's not reimbursed.

MR. KHODOROVSKY: And let me ask you this. During the--the same period we talked about, April 2009 to April 2010, how much did you give to that scholarship fund?

MR. LIMA: About $100.00 maybe.

MR. KHODOROVSKY: Total?

MR. LIMA: Yeah. Yeah, about $100.00 total because--yeah, I give more now than I did that year.

MR. KHODOROVSKY: Okay. Let's--let's

1

2        change subjects here and I want to talk to

3        you about the last line here.  Do you see tax

4        payments, $500.00 a month?

5             MR. LIMA:  Yes.

6             MR. KHODOROVSKY:  So who are those

7        payments to?

8             MR. LIMA:  Those are payments that I

9        have been making to New York State and IRS.

10             MR. KHODOROVSKY:  How much to the New

11        York State?  How much to the IRS?

12             MR. LIMA:  How much--oh--

13             MR. KHODOROVSKY:  (Interposing) Per

14        month?

15             MR. LIMA:  $250.00.

16             MR. KHODOROVSKY:  Each?

17             MR. LIMA:  Yes.

18             MR. KHODOROVSKY:  Per month?

19             MR. LIMA:  Per month, right.

20             MR. KHODOROVSKY:  And what does these

21        taxes that you are paying them, what do these

22        relate to?

23             MR. LIMA:  Those are all related to--

24        actually let--the majority of--I'm not so

25        great with the numbers on that, but the

2          majority of those payments are for my

3          personal businesses.  And so those were taxes

4          that I owed for the businesses, which I, you

5          know I couldn't discharge those.  So, I've

6          been budgeting that in, every month, paying

7          as much as I can.

8               MR. KHODOROVSKY:  And the ones for your

9          businesses, especially the ones to the state,

10         are they related to sales taxes or

11         withholding taxes or income taxes?  What kind

12         of taxes?  If you know?

13              MR. LIMA:  A small portion is the sales

14         tax.  I think it's just a regular business--

15              MR. KHODOROVSKY:  (Interposing) Business

16         income tax?

17              MR. LIMA:  Business income tax, yeah.  A

18         very small portion of personal paychecks.  I

19         think I paid myself about maybe $5,000.00 in

20         2009--a paycheck kind of just to my own self.

21         So, that--and I also, because Westwood

22         College is in Denver, I have to pay taxes to,

23         I think it's New York State or New York City.

24         But that's a very--that would be a very small

25         percentage, because I try to keep current on

that one, for income.

MR. KHODOROVSKY: Mm hmm. Let me ask you this question. Since you had filed for bankruptcy, after you had filed, are you current with those $500.00 a month payments?

MR. LIMA: Yes.

MR. KHODOROVSKY: And has--have the taxing authorities been billing you, even after you had filed?

MR. LIMA: Well, - - , yes.

MR. KHODOROVSKY: You had - - , you had filed for bankruptcy?

MR. LIMA: Yes. Yeah, the IRS I worked out a payment plan with them. I think it was $250.00 a month. It might have been less than that, but that was what--what I--the most I could do. And then the New York State actually never billed me, but I--

MR. KHODOROVSKY: (Interposing) After you filed?

MR. LIMA: Yeah, or even before. They never--they never billed me in terms of a payment plan or anything like that. I just paid them the same as I did the IRS, but in

2          fact they never even contacted me.

3               MR. KHODOROVSKY:  Okay.  Let's switch

4          gears a little bit.  And ask you very

5          different kinds of questions.  Mr. Lima, do

6          you currently own a vehicle of any kind?

7               MR. LIMA:  No.

8               MR. KHODOROVSKY:  Have you owned a

9          vehicle in the last five years?

10              MR. LIMA:  I've leased.

11              MR. KHODOROVSKY:  When did you lease a

12         car?

13              MR. LIMA:  I leased in 2000 and I had a

14         three year lease and a two year lease, total.

15         I think the--the lease ended early 2009.

16              MR. KHODOROVSKY:  What kind of a car was

17         it?

18              MR. LIMA:  BMW.

19              MR. KHODOROVSKY:  Do you know--do you

20         know the made and the model?

21              MR. LIMA:  Yeah it was--I had an X3 for

22         two years and then three years before that I

23         had a, like a--the smaller, the 300, 325

24         series.

25              MR. KHODOROVSKY:  A BMW?

1

2          MR. LIMA:  Yes.

3              MR. KHODOROVSKY:  Okay.  And the last--

4      your last vehicle, at the end of the lease,

5      did you just surrender the car?

6          MR. LIMA:  Yes.

7              MR. KHODOROVSKY:  Okay.  I'm asking you

8      this kind of question.  Mr. Lima, as we sit

9      here today, do you currently own any shares

10     of stock?

11         MR. LIMA:  No.

12             MR. KHODOROVSKY:  Any bonds?

13         MR. LIMA:  No.

14             MR. KHODOROVSKY:  Any mutual funds?

15         MR. LIMA:  No.

16             MR. KHODOROVSKY:  At your place of work,

17     do you have an IRA?

18         MR. LIMA:  IRA?

19             MR. KHODOROVSKY:  A retirement account.

20         MR. LIMA:  I have a 401(k).

21             MR. KHODOROVSKY:  You have a 401(k)?

22         MR. LIMA:  Yeah, I have two.

23             MR. KHODOROVSKY:  You have two 401(k)s?

24         MR. LIMA:  Yes.

25             MR. KHODOROVSKY:  Okay.  What about--let

me ask you about intellectual properties,

like trademarks copy writes or patents, do

you own any of that?

MR. LIMA:  No.

MR. KHODOROVSKY:  Okay.  And regarding

your companies--New York Urban Stone, and

Pedro Lima Design, are there any accounts

receivable receivables that they may be able

to collect from anybody?  Anybody not pay

them and they might have a right to get them

- - ?

MR. LIMA:  Yes.

MR. KHODOROVSKY:  They do?

MR. LIMA:  Yes.

MR. KHODOROVSKY:  And how much would

they have in--in unpaid receivables?

MR. LIMA:  It was--it was quite a bit.

Probably about--at least $50,000.00.

MR. KHODOROVSKY:  So, that's something

the clients never paid you?

MR. LIMA:  That's correct, yes.

MR. KHODOROVSKY:  Now, any of these

companies, when they operated, did they ever-

-did any of them ever have a website?

2          MR. LIMA:  Yes, they both had websites.

3          MR. KHODOROVSKY:  And did anybody have

4     copy writes to the content on the websites?

5     If you know?

6          MR. LIMA:  No.  No.  I know what you're

7     saying, no, I didn't have copy writes.  I

8     didn't want people to take my pictures,

9     because--but no, there was no copy write or

10     anything like that.

11          MR. KHODOROVSKY:  Okay.  Well, let me

12     ask you this.  Mr. Lima, for yourself,

13     personally, have you filed your 2009 tax

14     return?

15          MR. LIMA:  Yes, I have.

16          MR. KHODOROVSKY:  Okay, counsel, can you

17     get my office a copy of the 2009 return?

18          MR. HAMILTON:  Yes.

19          MR. KHODOROVSKY:  Because I--I don't

20     have it.

21          MR. HAMILTON:  Okay.

22          MR. KHODOROVSKY:  Okay.  Let's go back.

23     Let's turn to your Schedule G, as in George.

24     I want to talk to you about some of this - -

25     .

MR. HAMILTON:  - - before that.

MR. LIMA:  Okay.

MR. KHODOROVSKY:  Showcase Kitchens,
NYCD, do you see that listed?

MR. LIMA:  Yes.

MR. KHODOROVSKY:  Okay.  Lease for 11
West 25th Street, Second Floor, do you see
that?

MR. LIMA:  Yes.

MR. KHODOROVSKY:  Okay.  And is that the
lease for that office you talked about?

MR. LIMA:  Yes.

MR. KHODOROVSKY:  And you said you
stopped paying for it two months ago?

MR. LIMA:  Yes.

MR. KHODOROVSKY:  Are--is--is the
landlord making any attempts to evict you or
uh--?

MR. LIMA:  No, he likes me.  He's just--
he--essentially, I don't use the space.  I do
on occasion, but he is a kitchen showroom, so
there is other products that--he uses the
room for meetings and things like that.  But
he does let me use the address, currently.

2        And because of my position, with ASID, you

3        know he--he respects me as a designer, and I

4        think that it helps him to say that he is

5        affiliated, at least with me, and you know.

6            MR. KHODOROVSKY: I understand. Okay.

7        By the way, let me ask you this. How much is

8        the rent for that space each month?

9            MR. LIMA: Now it--

10           MR. KHODOROVSKY: (Interposing) - - you

11       haven't paid it for two months, but--

12           MR. LIMA: The uh--

13           MR. KHODOROVSKY: -other than that,

14       before then, how much was it?

15           MR. LIMA: Before that it was $1,500.00.

16           MR. KHODOROVSKY: A month?

17           MR. LIMA: Yeah--yes.

18           MR. KHODOROVSKY: Okay. Okay. Let's go

19       back and if you can turn--and counsel can

20       help you--to your Schedule F as in Franklin.

21       Okay. Mr. Lima, take a look at your Schedule

22       F. Are you there?

23           MR. LIMA: Yes.

24           MR. KHODOROVSKY: I would like to ask

25       you about some of your debts and liabilities

listed there.  Let me ask you, Mr. Lima, are
you familiar with the information contained
in your Schedule F?

MR. LIMA:  Yes.

MR. KHODOROVSKY:  Would you say that it
is true and accurate to the best of your
knowledge?

MR. LIMA:  Yes.

MR. KHODOROVSKY:  And as we sit here
today, Mr. Lima, would you like to make any
changes to the information in your schedule
F?

MR. LIMA:  Let me just--

MR. KHODOROVSKY:  (Interposing)
Definitely.

MR. LIMA:  -look again.  No, no changes.

MR. KHODOROVSKY:  Okay.  Let me ask you
about some of your accounts, some of your
debts listed here.  If you could turn to the
last page of it, of your Schedule.  Do you
see the--are you there?

MR. LIMA:  Yes.

MR. KHODOROVSKY:  Do you see there
listed an account with a T.D. Bank?

MR. LIMA:  Yes.

MR. KHODOROVSKY:  The last four digits--

MR. LIMA:  (Interposing) I'm sorry.

MR. KHODOROVSKY:  Let me finish.  I
apologize.  Do you see there listed an
account with T.D. Bank, last four digits of
the account being 8213?

MR. LIMA:  Yes.

MR. KHODOROVSKY:  The very top line.
What is--what is that?  What is that
liability?

MR. LIMA:  That is a line of credit,
for--

MR. KHODOROVSKY:  (Interposing) For - -
?

MR. LIMA:  No, for Pedro Lima Design.

MR. KHODOROVSKY:  And you guaranteed it?

MR. LIMA:  I guaranteed a portion of it.

MR. KHODOROVSKY:  How much did you
guarantee?

MR. LIMA:  I believe it was up to
$25,000.00.

MR. KHODOROVSKY:  The reason I'm asking,
because you said $25,000.00, but I see here

2          the debt is $51,925.65.  Why is it--why is it

3          so high?  So, in excess of the $25,000.00?

4               MR. LIMA:  The guarantee is--the credit

5          was fifty--the line of credit total was

6          $50,000.00, but in the contract, just in

7          through the--the whole process of the

8          bankruptcy, I tried to be as familiar with

9          what's--and I--and I saw that it was half of

10         the line of credit.  I was the--I personally

11         guaranteed that, even though it was a

12         business line of credit.

13              MR. KHODOROVSKY:  Okay, no, no, I

14         understand.  Thank you.

15              MR. LIMA:  Okay.

16              MR. KHODOROVSKY:  Let's go to the page

17         right before this.  Do you see there a--a--

18         you listed as a creditor, with an unknown

19         amount, a company called SACHE Payment

20         Solutions.

21              MR. LIMA:  Yes.

22              MR. KHODOROVSKY:  What is that?

23              MR. LIMA:  That is a credit collections

24         company.

25              MR. KHODOROVSKY:  They're collecting on

one of your credit cards?

MR. LIMA:  No, that's not a credit card
that I own.  That's a--that's a--that was a
company that was--that had to do with a
client not paying me the--the amount of money
that they should have and so--

MR. KHODOROVSKY:  (Interposing) So,
they're collecting for you--collecting money
other people owed you?

MR. LIMA:  Actually, you know what?
That--that was--the client had paid me--

MR. KHODOROVSKY:  I guess the client
paid you with a credit card, or--?

MR. LIMA:  They did pay me with a credit
card, a portion of their final balance, which
is for stone.  But I actually billed that
through my Pedro Lima Design, not Urban
Stone.  And then they tried to reverse the
charges.  I want to make sure I'm saying that
right--

MR. KHODOROVSKY:  (Interposing) No, I
understand what you're saying.

MR. LIMA:  -they tried to reverse the
charges--

1

2          MR. KHODOROVSKY:  (Interposing) I

3     actually understand what you are saying.

4          MR. LIMA:  -because they weren't happy.

5     And so, the--that company--

6          MR. KHODOROVSKY:  (Interposing) You

7     hired them to collect it?

8          MR. LIMA:  No, no, they were trying to

9     get the money back from me, for their

10    materials, which they already had in their

11    house.

12         MR. KHODOROVSKY:  So, the company was

13    collecting from you, for that client?

14         MR. LIMA:  Yes.

15         MR. KHODOROVSKY:  I'm understanding.

16    Okay, great.  The one--there is a line right

17    about it, the company called MZM.

18         MR. LIMA:  Yes.

19         MR. KHODOROVSKY:  What is MZM?

20         MR. LIMA:  MZM is a furniture

21    manufacturer.

22         MR. KHODOROVSKY:  And you would buy

23    their product?

24         MR. LIMA:  Yes.

25         MR. KHODOROVSKY:  To resell through your

businesses?

MR. LIMA:  Yes.

MR. KHODOROVSKY:  Would you buy them personally or in the name of the companies?

MR. LIMA:  In the name of the companies.

MR. KHODOROVSKY:  But were you personally liable on--for anything that you haven't paid those companies?  Did you guarantee that?

MR. LIMA:  Written, no.  But, it--it was assumed that--that those payments would be made--

MR. KHODOROVSKY:  (Interposing) Okay.

MR. LIMA:  -regardless.

MR. KHODOROVSKY:  I understand.  The very last line here, Shoenbeck World Wide Lighting.

MR. LIMA:  Mm hmm.

MR. KHODOROVSKY:  What is that?

MR. LIMA:  That is a lighting company, a lighting manufacturer.

MR. KHODOROVSKY:  Would you buy their product?

MR. LIMA:  Yes.

2              MR. KHODOROVSKY:  For yourself or in the

3         names of the--through the companies?

4              MR. LIMA:  Through the companies.

5              MR. KHODOROVSKY:  Which one, Pedro Lima

6         Design, or Urban Stone?

7              MR. LIMA:  Pedro Lima Design.  If I may

8         explain one--one thing about that, it's the

9         Shoenbeck had--that company has a minimum

10        order, for products, in order to purchase.

11        So, I bought things, in order to--to take the

12        order from the client, I needed to buy

13        additional product that wasn't included in

14        their order.  So, I just used my own money to

15        pay the difference for those--for the extra--

16        I'm going to say the extra product.

17             MR. KHODOROVSKY:  Okay.  So, let's--

18        let's think of it a little bit differently.

19        So, there is a minimum order from Shoenbeck

20        Worldwide Lighting.  So, your client orders a

21        certain amount, which is less than the

22        minimum order.  And the--whatever is the

23        surplus, you pay for with your own money.

24        Right?

25             MR. LIMA:  Yes.

2          MR. KHODOROVSKY:  So, what happens to

3     the product?  Who--who keeps it?

4          MR. LIMA:  Well,--

5          MR. KHODOROVSKY:  (Interposing) The

6     surplus product?

7          MR. LIMA:  I resold those products for

8     more than I purchased them.  So, I made a

9     profit on them.  So, I applied the profit, in

10    my mind at least, in the bank account, I

11    didn't necessarily go through all those

12    numbers, but the--the extra earnings from the

13    profit, I figured would cover the additional

14    cost of the product that I had to--to get.

15    So, those extra--they were some lamps, became

16    property of Pedro Lima Design.  So, in

17    essence, they were like an inventory.

18         MR. KHODOROVSKY:  Okay.  And do you

19    currently--do you currently own any Shoenbeck

20    Worldwide Lighting products right now?

21         MR. LIMA:  Yes.

22         MR. KHODOROVSKY:  How much do you own

23    of--of those products?

24         MR. LIMA:  I have three lamps.

25         MR. KHODOROVSKY:  And where are they?

1

2          MR. LIMA:  They are in my apartment.

3          MR. KHODOROVSKY:  Do you plan to resell

4      them?

5          MR. LIMA:  I have tried, many times, to

6      resell them, yes.  I can't--I haven't had any

7      luck.  Even at the wholesale value, they're

8      somewhat expensive and so I'm having a hard

9      time--I'm trying to sell those.

10         MR. KHODOROVSKY:  Okay. And MZM, do you

11     own any of their product right now?

12         MR. LIMA:  No.

13         MR. KHODOROVSKY:  Okay.  Right above--

14     above MZM, do you see there is a line item

15     for Infusion Soft?

16         MR. LIMA:  Yes.

17         MR. KHODOROVSKY:  Website creation?

18     What does Infusion Soft do?

19         MR. LIMA:  Infusion Soft was a website--

20     I'm going to say like a website management

21     company.  And that was affiliated with my

22     website for New York Urban Stone.

23         MR. KHODOROVSKY:  They managed that

24     website?

25         MR. LIMA:  Yeah, they did.  Yeah.  I'm

2    not sure if managed is the right word, but--

3    MR. KHODOROVSKY: (Interposing) Did they

4    create it?

5    MR. LIMA: No. I actually created that.

6    MR. KHODOROVSKY: Yourself?

7    MR. LIMA: Yes. I created it. New York

8    Urban Stone was a--was--was all kind of a

9    little bit homespun, in the sense that I

10    tried to do everything myself, as much as

11    possible. And then I think this is

12    important, because Infusion Soft was

13    something that I was--I--I feel like that--

14    that was something that was geared towards

15    search engine optimization, essentially.

16    MR. KHODOROVSKY: I understand.

17    MR. LIMA: Which is a way to sell the

18    product and--and I really wasn't ready to

19    make those--to step into that yet. And I

20    actually never got ready. I don't think I

21    ever needed that. And I was current on all

22    of my payments for them, regardless of the

23    fact that I wasn't making any money in--as

24    the company to pay that. But I was covering

25    it, however I had to. And then, after I

1

2      cancelled the contract, months later, they

3      tried to collect money from me, for canceling

4      the contract.  So, they kept trying to get

5      money, even though I paid them--I'm not sure

6      if I missed a month, but I paid them as--as

7      much as I could.  You know, I paid them

8      properly throughout the term of the

9      agreement.  So,--

10          MR. KHODOROVSKY:  Let me ask you this

11     question.  Have they tried to collect from

12     you, after you had filed for bankruptcy?

13          MR. LIMA:  No.

14          MR. KHODOROVSKY:  Well then, let's

15     switch gears.  And I would like to ask you

16     some of your questions--I would like to ask

17     you, Mr. Lima, some questions about your - -

18     transactions on your credit cards.  And your

19     counsel provided us with some credit card

20     statements.  So, we would like to ask you

21     some of them.  The statements are right--are

22     provided in there.

23          MR. LIMA:  Okay.

24          MR. KHODOROVSKY:  In that packet.  These

25     are not all the statements your counsel

2    provided to us.  These are some.  We selected

3    them; you know we just have questions about

4    certain transactions, not all of them.  We'll

5    go over them page by page.  So, what you need

6    to do is, what I am going to ask you is, to

7    the best of your recollection, when we ask

8    you about an item, just tell us what did you-

9    -if you bought it, what did you buy, why did

10   you buy it, what happened to it.  If you

11   even--if you even bought it at all.

12        So, let's start with the--the first page

13   that we have here.  There is a--you see

14   before you the Alaska Airlines mileage plan

15   card, from Bank of America, last four digits

16   of the account being 0581.  The statement is

17   for April 2007.  Do you see that?

18        MR. LIMA:  Yes.

19        MR. KHODOROVSKY:  And did you ever have

20   a--a card with that account number?

21        MR. LIMA:  Yes.

22        MR. KHODOROVSKY:  I want to ask you

23   about some charges on this page, that we are

24   looking at here.  There is a charge there,

25   with a posting date of March 19th,

2          transaction date of March 16th, for $450.00

3          for somebody named Markus Lemchem, L-E-M-C-H-

4          E-M.  Who is--who is that?  Do you see that

5          charge?

6               MR. LIMA:  Mark Lemchem is a lawyer.

7               MR. KHODOROVSKY:  What does he do, for

8          you?

9               MR. LIMA:  He--he helped me write my

10         business contracts, um--I'm trying to--I'm

11         sorry: I'm--I can't remember all of the

12         reasons why I used him.  But I have used him

13         - - .

14              MR. KHODOROVSKY:  But you used him as a

15         lawyer?

16              MR. LIMA:  Yes.

17              MR. KHODOROVSKY:  Okay, let's flip the

18         page.  Okay, do you see there, I am showing

19         there, on the same American Airlines Mileage

20         Plan Bank of America credit card, last four

21         digits of the account number being 0581.  Do

22         you see that page?

23              MR. LIMA:  Yes.

24              MR. KHODOROVSKY:  Okay, good.  Do you

25         see there a charge--if you go down, Cherry

1

2          Lawn Nursery, from New Rochelle, New York, of

3          $192.92 with a transaction date of April

4          22nd?

5               MR. LIMA:  Yes.

6               MR. KHODOROVSKY:  Do you see that?

7               MR. LIMA:  Yes.

8               MR. KHODOROVSKY:  And Mr. Lima, did you

9          make that transaction?

10               MR. LIMA:  I did.

11               MR. KHODOROVSKY:  And what was that for?

12               MR. LIMA:  That was--those were plants

13          that I purchased for my--my apartment.  And I

14          got some pots for the plants, and sometimes I

15          can sell things like the pots, if I have a

16          project and I--or I use them in my

17          photography for my jobs, just little things

18          like that.  So, they're--mostly though that

19          was for the--the foliage, the plants for my

20          apartment.

21               MR. KHODOROVSKY:  You said you used them

22          for photography for your job.  Do you own a

23          camera?

24               MR. LIMA:  I do.  It's not very good,

25          but yes, I do.

1

2          MR. KHODOROVSKY:  You do.  And what kind

3     of a camera do you own?

4          MR. LIMA:  It's a Nikon--it's a Nikon.

5          MR. KHODOROVSKY:  Is it a digital

6     camera?

7          MR. LIMA:  Yeah.

8          MR. KHODOROVSKY:  Is it a professional

9     camera?

10          MR. LIMA:  No.

11          MR. KHODOROVSKY:  So, it's something

12     that a casual person would use?

13          MR. LIMA:  It is, yes.

14          MR. KHODOROVSKY:  Okay.  Staying on the

15     same page, I wanted to ask you--see there

16     right below the Cherry Lawn Nursery, there's

17     a transaction with a Redwood Nursery of

18     Larchmont, New York for April 22nd of 2007?

19          MR. LIMA:  Yes.

20          MR. KHODOROVSKY:  Of $303.89

21     transaction?

22          MR. LIMA:  I thought that was what we

23     were just looking at.

24          MR. KHODOROVSKY:  We were looking at the

25     Cherry Lawn Nursery.

1

2          MR. LIMA:  We were looking at the--okay.

3          MR. KHODOROVSKY:  Now, I'm asking you

4     about Redwood Nursery.

5          MR. LIMA:  The--okay, the Redwood, okay.

6          MR. KHODOROVSKY:  What was that for?

7          MR. LIMA:  More plants.  Same thing.

8     Same thing.

9          MR. KHODOROVSKY:  I understand.  Let's--

10    let's flip the page.

11         MR. LIMA:  Okay.

12         MR. KHODOROVSKY:  If you stay--do you

13    see that I'm showing you the credit card

14    statement for June 2007, for the American

15    Airlines Plan, last four digits being 0581 of

16    the account.  Do you see that?

17         MR. LIMA:  Oh, yes, uh huh.

18         MR. KHODOROVSKY:  Okay.  Let's stay on

19    that page.  This statement is for June 2007.

20    Do you see there a transaction for--on May

21    10th of 2007, with something called--for

22    $273.06, something called Photo Art?

23         MR. LIMA:  I don't see that.  Where is

24    that?

25         MR. HAMILTON:  It's that one there.

2          MR. LIMA:  Oh, okay, Photo Art.

3          MR. KHODOROVSKY:  Do you see that?

4          MR. LIMA:  Yes.

5          MR. KHODOROVSKY:  What was that

6     transaction for?  Well, first of all; sorry--

7     withdrawn.  Did you make this transaction?

8          MR. LIMA:  Yes.

9          MR. KHODOROVSKY:  What was that for?

10         MR. LIMA:  I don't remember, actually.

11         MR. KHODOROVSKY:  Let's go up one line.

12    Do you see there a transaction for May 10th,

13    '07, for $342.36 for something called NS

14    Nutri System of Pennsylvania?  Do you see

15    that transaction?

16         MR. LIMA:  Yes.

17         MR. KHODOROVSKY:  Did you make that

18    transaction?

19         MR. LIMA:  Yes, I did.

20         MR. KHODOROVSKY:  What was that for?

21         MR. LIMA:  That was for diet--for food

22    for Nutri System, the--

23         MR. KHODOROVSKY:  (Interposing) The diet

24    food company?

25         MR. LIMA:  The diet food company, right,

yeah.

MR. KHODOROVSKY:  Okay.  Okay.  Let's

look almost at the next to last line on the--

on the charges.  Do you see there a charge on

May 26th, '07 for New York Times Job Market,

of $583.00?  Do you see that?

MR. LIMA:  Yes.

MR. KHODOROVSKY:  Did you make that

transaction?

MR. LIMA:  Yes.

MR. KHODOROVSKY:  What was it for?

MR. LIMA:  I don't remember that.  I

apologize; I don't remember what that was

for.

MR. KHODOROVSKY:  No, please testify to

the best of your knowledge.  If you--

MR. LIMA:  (Interposing) I'm sorry.

MR. KHODOROVSKY:  -don't remember, you

don't remember.

MR. LIMA:  I don't remember what that

was for.

MR. KHODOROVSKY:  Okay.  Let's move to

the next page.  We are still on the same

credit card, Alaska--Alaska Airlines, last

2        four digits being 0581, statement for August

3        2007.  Do you see that?

4             MR. LIMA:  No.  Can you say--I'm sorry.

5             MR. KHODOROVSKY:  I'm sorry; I

6        apologize.  Let me slow down a little bit.

7        Do you see that we are on the August 2007

8        statement for the Alaskan Airlines credit

9        card, the last four digits being zero--of the

10       account number being 0581?

11            MR. LIMA:  Yes.

12            MR. KHODOROVSKY:  Do you see that?

13       Excellent.  Excellent.  Okay.  Let's--let's

14       look at this page here.  Do you see there a

15       charge for $119.00 made on July 8th, 2007, at

16       something called Luna 61 in Tivoli, New York?

17            MR. LIMA:  Yes.

18            MR. KHODOROVSKY:  Do you see that?

19            MR. LIMA:  Yes.

20            MR. KHODOROVSKY:  Did you make this

21       transaction?

22            MR. LIMA:  I did.

23            MR. KHODOROVSKY:  What was that for?

24            MR. LIMA:  That was a food--that was a

25       restaurant that I went to.

1

2          MR. KHODOROVSKY:  Okay.  And--and

3     actually, let's look at the next to last line

4     on the page.  Do you see there a transaction

5     on July 29th, 2007, $499.00 with a company

6     called Logo Works, in Utah?

7          MR. LIMA:  Yes.

8          MR. KHODOROVSKY:  Did you make this

9     transaction?

10         MR. LIMA:  Yes.

11         MR. KHODOROVSKY:  What was that for?

12         MR. LIMA:  That was for graphic design

13    work to make some logos.

14         MR. KHODOROVSKY:  Okay.  For your

15    company?

16         MR. LIMA:  I think it might have been

17    letterhead, to make the letterhead or the

18    envelopes, yes those are--those are for my

19    company.

20         MR. KHODOROVSKY:  Okay.  Let's flip to

21    the next page.  Do you see--you're looking at

22    the Visa Signature Card, December 2007

23    statement, last four digits of the account

24    being 0581?

25         MR. LIMA:  Yes.

2                MR. KHODOROVSKY:  Okay.  Let's look at

3        the second line here.  Do you see a charge

4        for November 23rd, '07, for $234.00 at the

5        Senator Inn Spa in Augusta, Maine?

6                MR. LIMA:  Yes.

7                MR. KHODOROVSKY:  Did you make that

8        transaction?

9                MR. LIMA:  I did.

10               MR. KHODOROVSKY:  What was that for?

11               MR. LIMA:  That was for a massage, two

12       people.

13               MR. KHODOROVSKY:  At--at that hotel?

14               MR. LIMA:  Yes.

15               MR. KHODOROVSKY:  Okay.  Let's--let's go

16       down to the third transaction from the top--

17       from the bottom; I apologize--third

18       transaction from the bottom.  Do you see

19       there a charge for $199.60 made on December

20       2nd, '07 for PayPal Hawaiian SCE?  Did you

21       make this transaction?

22               MR. LIMA:  Yes.

23               MR. KHODOROVSKY:  What was that for?  If

24       you remember?

25               MR. LIMA:  PayPal Hawaiian SCE.  I don't

1

2      remember.

3            MR. KHODOROVSKY:  Okay.  The next

4      transaction below that, do you see a

5      transaction with a transaction date of

6      December 4th, '07 made at--for $104.83 with

7      the Executive Essentials in Illinois?

8            MR. LIMA:  Yes.

9            MR. KHODOROVSKY:  What was that for?

10     Sorry; withdrawn.  Did you make this

11     transaction?

12           MR. LIMA:  Yes.

13           MR. KHODOROVSKY:  What was it for?

14           MR. LIMA:  I don't remember that either.

15     Essentials--

16           MR. KHODOROVSKY:  (Interposing) Okay.

17           MR. LIMA:  Oh, no, that's--I do

18     remember.  That is--those are like health

19     care--not health care--grooming products.

20           MR. KHODOROVSKY:  Personal grooming

21     products?

22           MR. LIMA:  Personal grooming products,

23     yes.

24           MR. KHODOROVSKY:  Okay.  And right

25     below, do you see a transaction on December

1

2      4th, of '07, with a--for $85.31 at Sunburst

3      Bottle Company?

4           MR. LIMA:  Yes.

5           MR. KHODOROVSKY:  Did you make this

6      transaction?

7           MR. LIMA:  Yes.

8           MR. KHODOROVSKY:  And to the best of

9      your knowledge, what was that for?

10          MR. LIMA:  Sunburst Bottle--I took a

11     trip to Hawaii.  I don't even remember the

12     year, but this might be--this might be

13     related to that--maybe--maybe not.  I don't

14     know, but the only thing I can think of is

15     that it would be wine, from that trip.

16     Sunburst Bottle?

17          MR. KHODOROVSKY:  So you bought wine on

18     the trip to Hawaii?

19          MR. LIMA:  Yeah, but I bought it in

20     Hawaii.

21          MR. KHODOROVSKY:  And do you have--do

22     you have that wine in your possession now?

23          MR. LIMA:  No, I drank it.

24          MR. KHODOROVSKY:  Maybe--maybe this will

25     help you remember.  It says on the statement,

1

2          as you are looking at it right now, it says

3          put some miles on Alaska Airlines.  Did you

4          fly to Hawaii on Alaska Airlines?

5               MR. LIMA:  Yes, I think I did.  I think

6          I did.

7               MR. KHODOROVSKY:  I just--I was thinking

8          maybe that would help you remember.

9               MR. LIMA:  Where does it say that?

10               MR. KHODOROVSKY:  You see there below--

11          Alaska Airlines credit card rewards?

12               MR. LIMA:  Yeah.

13               MR. KHODOROVSKY:  Do you see it adds

14          miles--to the credit card?

15               MR. LIMA:  Okay, yes.

16               MR. KHODOROVSKY:  So, my point being

17          that's what I was trying to help you

18          remember.

19               MR. LIMA:  That's Hawaii?  That must be

20          Hawaii--that's Hawaii then.

21               MR. KHODOROVSKY:  Okay.  Okay, let's--

22          let's flip to the next page.  Actually, it's

23          double sided, so this page.  Do you see

24          there, again, we are staying on this

25          statement for December 2007, for the same

card?

MR. LIMA:  Yes.

MR. KHODOROVSKY:  Do you see that?

MR. LIMA:  Yes.

MR. KHODOROVSKY:  Okay.  I want to ask you about one transaction listed here.  You see there a charge for November 20th of '07, for $177.32 at Thomas Cantonese and Company, in Plymouth?  Do you see that transaction?

MR. LIMA:  Yes.

MR. KHODOROVSKY:  Did you make that transaction?

MR. LIMA:  Yes.

MR. KHODOROVSKY:  To the best of your recollection, what was it for?

MR. LIMA:  That's a food expense, a restaurant expense.

MR. KHODOROVSKY:  Okay.  Let's flip to the next page, the one you're looking at. You see that this is a January 2008 statement for Visa Signature Card, last four digits being 0581?

MR. LIMA:  Yes.

MR. KHODOROVSKY:  Okay.  I want do ask

2          you about a couple of transactions here.  At

3          the very bottom, do you see there a

4          transaction for $90.04 on December 28th, '08;

5          it says Weisberger S7S Heartland, Wisconsin.

6          Do you see that transaction?

7               MR. LIMA:  Yes.

8               MR. KHODOROVSKY:  Did you make that

9          transaction?

10              MR. LIMA:  Yes.

11              MR. KHODOROVSKY:  What was it for, to

12         the best of your recollection?

13              MR. LIMA:  This was--I'm pretty--I had

14         went--I went to see my parents.

15              MR. KHODOROVSKY:  In Wisconsin?

16              MR. LIMA:  In--who--yeah, in Wisconsin.

17         And that is most likely a lunch.

18              MR. KHODOROVSKY:  Like at a restaurant?

19              MR. LIMA:  A brunch at a restaurant.

20              MR. KHODOROVSKY:  Okay.

21              MR. LIMA:  Yes, and I'm sorry; I

22         apologize, I don't remember the name of that

23         restaurant.  It wasn't Wiesenberger Steven

24         though.

25              MR. KHODOROVSKY:  It says Weingarten's

1

2          Seven--

3               MR. LIMA:  (Interposing) Whatever that--

4          it wasn't something--it wasn't that.

5               MR. KHODOROVSKY:  Okay.  Let's--let's

6          flip to the next page.  We're still on the

7          Visa Signature Card.  I'm going to ask you

8          about a couple of transactions on this page.

9          Do you see there an Alaska Airlines mileage

10         fund Visa Signature Card, last four digits of

11         the account now being 5261?  Do you see that?

12              MR. LIMA:  Yes.

13              MR. KHODOROVSKY:  Okay.  I want to ask

14         you about some of these transactions here.

15         The third transaction, from the top, on the

16         line it says purchases and adjustments, do

17         you see a transaction there on January 7th,

18         '08, transaction date, for the Leather

19         Collection,--

20              MR. LIMA:  (Interposing) I do.

21              MR. KHODOROVSKY:  -in North Carolina,

22         for $200.51?

23              MR. LIMA:  Yes.

24              MR. KHODOROVSKY:  Did you make that

25         transaction?

1

2          MR. LIMA:  Yes.

3          MR. KHODOROVSKY:  What was it for?

4          MR. LIMA:  That was for product for a

5     client.

6          MR. KHODOROVSKY:  Are you in possession

7     of that product now?

8          MR. LIMA:  No.

9          MR. KHODOROVSKY:  Has then--you would

10    say the client is in possession of the

11    product?

12         MR. LIMA:  Yes.

13         MR. KHODOROVSKY:  Okay.  What's--let's

14    move down a little bit.  Do you see there a

15    transaction on January 8th, '08, for $222.08

16    at SKS Bottle and Package?

17         MR. LIMA:  Is that--say that again, I'm

18    sorry.

19         MR. KHODOROVSKY:  SKS Bottle and

20    Package, transaction date January 8th, '08,

21    the charge is $222.08.

22         MR. LIMA:  Yes.

23         MR. KHODOROVSKY:  Do you see that?

24         MR. LIMA:  Yes.

25         MR. KHODOROVSKY:  Okay.  And to the best

1

2        of your recollection, did you make this

3        transaction?

4             MR. LIMA:  Yes.

5             MR. KHODOROVSKY:  And what was it for?

6             MR. LIMA:  This is for bottles for my

7        boyfriend's company.

8             MR. KHODOROVSKY:  What kind of bottles?

9             MR. LIMA:  This--he started a skin care

10        company.

11             MR. KHODOROVSKY:  Mm hmm.

12             MR. LIMA:  And he was--basically, he--I

13        helped him out with making the little oils

14        and things and we put them in the bottles and

15        we sold them--or he sold them.  I had nothing

16        to do with the company, but um he sold--I

17        think this might have been--I have to be

18        honest, I don't remember if it was for

19        samples or for the product bottles, probably

20        the product bottles.  For his--

21             MR. KHODOROVSKY:  (Interposing) What was

22        the name of that company?

23             MR. LIMA:  Argonne--Argonne Body.

24             MR. KHODOROVSKY:  I apologize; I'm going

25        to ask you,--I apologize, I'm going to ask

2          you to spell it.  Argonne, how do you--

3              MR. LIMA:  A-R-G-A-N.

4              MR. KHODOROVSKY:  Body--two words?

5              MR. LIMA:  Yes.

6              MR. KHODOROVSKY:  Is that an Inc. or an

7          LLC, or--to the best of your knowledge?

8              MR. LIMA:  LLC, I think.

9              MR. KHODOROVSKY:  And A-R-G-A-N, right?

10             MR. LIMA:  Yes.

11             MR. KHODOROVSKY:  And do you have any

12         interest, stock ownership interest in this

13         company?

14             MR. LIMA:  No.

15             MR. KHODOROVSKY:  And do you receive any

16         income from this company?

17             MR. LIMA:  No.

18             MR. KHODOROVSKY:  And would you say your

19         boyfriend is, I guess the--the sole owner of

20         the company?

21             MR. LIMA:  Yes.

22             MR. KHODOROVSKY:  Okay.  Staying on the

23         same credit card statement, look--if you

24         could look below the transaction we were just

25         talking about, do you see there is a charge

1

2    for--well, I'll give it in foreign and

3    American currency--18,700 U Israeli shekels,

4    and $4,941.87 American dollars--

5         MR. LIMA:  (Interposing) Mm hmm.

6         MR. KHODOROVSKY:  -on January 8th, '08,

7    do you see that transaction?

8         MR. LIMA:  Yes.

9         MR. KHODOROVSKY:  It says - - or Akiva,

10   Israel.

11        MR. LIMA:  Yes.

12        MR. KHODOROVSKY:  Did you make this

13   transaction?

14        MR. LIMA:  Yes, I did.

15        MR. KHODOROVSKY:  What was it for?

16        MR. LIMA:  That's for the product for

17   his company.

18        MR. KHODOROVSKY:  This--this was a skin

19   care product?

20        MR. LIMA:  Yes.

21        MR. KHODOROVSKY:  Can you--

22        MR. LIMA:  (Interposing) That was the

23   product that was um his Dead Sea shower gel

24   and things like that.

25        MR. KHODOROVSKY:  Did--did--did he and

you go to Israel to get the product?

        MR. LIMA:  No, he uh, he bought this
from a manufacturer there that he found, just
sourcing through, you know various wholesale.

        MR. KHODOROVSKY:  So, he just--so--so it
was just bought directly from Israel?

        MR. LIMA:  Yes.

        MR. KHODOROVSKY:  Okay.

        MR. LIMA:  That was the product that one
of the products that Argan Body sold.

        MR. KHODOROVSKY:  Is Argan Body still
around, as a company?

        MR. LIMA:  No.

        MR. KHODOROVSKY:  When--when did it stop
doing business?  If you know?

        MR. LIMA:  I don't remember.  I don't
remember.  I may not even know.  I don't
remember.

        MR. KHODOROVSKY:  If you don't know, say
don't know.

        MR. LIMA:  I don't know.  I don't know.

        MR. KHODOROVSKY:  Okay.  Is--is this
product currently in your possession now?

        MR. LIMA:  No.

1

2      MR. KHODOROVSKY:  Was this--all of this

3      product, from Israel, was it all sold?

4           MR. LIMA:  No.

5           MR. KHODOROVSKY:  Who has the product,

6      to the best of your knowledge?

7           MR. LIMA:  The product--when the

8      company--I don't know if--he decided not to

9      keep this company, not to keep going with

10     this.

11          MR. KHODOROVSKY:  Mm hmm.

12          MR. LIMA:  So, he had left over product.

13     So, he donated it to a charitable

14     organization.

15          MR. KHODOROVSKY:  It was donated--when

16     did it happen?

17          MR. LIMA:  But this might--

18          MR. KHODOROVSKY:  (Interposing) When was

19     it donated?

20          MR. LIMA:  I don't remember.  This might

21     be--there were various purchases for that

22     company, and I don't remember--I don't know

23     if they were all on my cards or his.  But

24     this might have been the start up, because

25     the bottles we--we stopped doing that, after

2        a while, with the bottles.  I think we had

3        Israel bottle them directly.  So, this might

4        be like one of the first inventories that he

5        did.

6            MR. KHODOROVSKY:  So the product would

7        be shipped to the clients direct from Israel?

8            MR. LIMA:  No, it was shipped to him.

9            MR. KHODOROVSKY:  So, it was shipped

10       from Israel directly to him.

11           MR. LIMA:  Yes.

12           MR. KHODOROVSKY:  And then he sold it to

13       clients?

14           MR. LIMA:  Yes.  Uh huh.

15           MR. KHODOROVSKY:  I understand.

16           MR. LIMA:  So, I just don't know if this

17       is like the stuff that he donated, or if this

18       was all sold.

19           MR. KHODOROVSKY:  But would you say

20       it's--would you say, to the best of your

21       knowledge, this Israeli product, is it still

22       in his possession?

23           MR. LIMA:  No.  No.

24           MR. KHODOROVSKY:  Okay.  Let's flip the

25       page to the--to the next page, this page.

MR. LIMA:  Okay.

MR. KHODOROVSKY:  Thank you.  You see there--and we are looking at the February 2008 statement for you from Alaska Airlines Mileage Plan, last four digits of the account number being 5261.  Do you see that?

MR. LIMA:  Yes.

MR. KHODOROVSKY:  Okay, great.  Do you see there a charge on that page--and maybe our copy and your attorney's copy - - cut off.  It says assagewarehouse.com for $111.09 on January 24th, '08, do you see that transaction?

MR. LIMA:  Yes.

MR. KHODOROVSKY:  Did you make that transaction?

MR. LIMA:  Yes.

MR. KHODOROVSKY:  What was it for?

MR. LIMA:  That was related to Peter's company.  I don't know exactly what that was for, but Peter would make--

MR. KHODOROVSKY:  (Interposing) - - product?

MR. LIMA:  Peter would make some of

these charges.  He would ask me, but he would

make some of these charges, and we shared a

bank account, so some--he would always just

let me know.

MR. KHODOROVSKY:  But would this--would

this be product?

MR. LIMA:  This would be--this would be

product, I'm--

MR. KHODOROVSKY:  (Interposing) And are

you in possession of this product now?

MR. LIMA:  No.

MR. KHODOROVSKY:  Let's move to the next

page.  We are looking again at your Visa

Signature Card, last four digits of the

account being 5261.

MR. LIMA:  Okay.

MR. KHODOROVSKY:  The statement being

for June 2008.  I have a question about one

transaction on this page.  Do you see a

charge there for May 9th, '08, for $195.00 to

the New York City Criminal Court?

MR. LIMA:  Yeah--yes.

MR. KHODOROVSKY:  Did you make this

transaction?

1

2              MR. LIMA:  Yes.

3              MR. KHODOROVSKY:  What was it for?

4              MR. LIMA:  That was for a ticket, a

5         driving ticket that I received.

6              MR. KHODOROVSKY:  A parking ticket?

7              MR. LIMA:  No.  I was uh--I was like

8         careless driving or something like that.

9              MR. KHODOROVSKY:  Did you get into an

10        accident?

11             MR. LIMA:  No, I didn't get into an

12        accident.  I took a left turn really fast.

13             MR. KHODOROVSKY:  You speeded?

14             MR. LIMA:  Yeah, I speeded.

15             MR. KHODOROVSKY:  So, it was a speeding

16        ticket?

17             MR. LIMA:  It was a speeding ticket,

18        essentially, yeah.

19             MR. KHODOROVSKY:  Okay.  Okay, well,

20        let's move to the next page.  I'm going to

21        try to get through these as fast as I can.

22        Let's--do you see as you're looking at the,

23        again, the Visa Signature card Alaska

24        Airlines, last four digits of the account

25        number being 5261, for January 2009, do you

1

2      see that statement?

3              MR. LIMA:  Yes.

4              MR. KHODOROVSKY:  Okay.  I want to ask

5      you about a couple of the transactions on

6      this page.  Do you see there listed a--I

7      apologize--do you see there listed, on the

8      top line, the transaction for--made on

9      transaction date of December 16th, '08, for

10     $175.00 at ChampionUSA.com?

11             MR. LIMA:  Yes.

12             MR. KHODOROVSKY:  Did you make this

13     transaction?

14             MR. LIMA:  Yes.

15             MR. KHODOROVSKY:  Do you know what it is

16     for?

17             MR. LIMA:  Those are gifts for the

18     holidays.

19             MR. KHODOROVSKY:  Christmas gifts?

20             MR. LIMA:  Yes, Christmas gifts.

21             MR. KHODOROVSKY:  Okay.  And those

22     gifts--are any of them in your current

23     possession?

24             MR. LIMA:  No.

25             MR. KHODOROVSKY:  Okay.  Let's go down a

2          little bit.  Do you see there a transaction,

3          lower on the page, for December 18th, '08,

4          for $255.22 at Banana Republic online?

5                    MR. LIMA:  Yes.

6                    MR. KHODOROVSKY:  Okay.  Did you make

7          this transaction?

8                    MR. LIMA:  Yes.

9                    MR. KHODOROVSKY:  What was it for?

10                   MR. LIMA:  Christmas presents.

11                   MR. KHODOROVSKY:  And any of those items

12         still in your possession?

13                   MR. LIMA:  No.  Gifts to other people.

14                   MR. KHODOROVSKY:  I understand.  Okay.

15         Let's--let's flip the page.  We are now done

16         with that--with that particular credit card.

17         Okay.  Do you see that I'm showing you now

18         the--an American Express card--an American

19         Express open card, last four digits of the

20         account number being 1007.  The statement has

21         a closing date of January 1st, '08, for Pedro

22         Lima, Pedro Lima Design.

23                   MR. LIMA:  Yes.

24                   MR. KHODOROVSKY:  Let me ask you this

25         question first.  Are you familiar with an

2      address of 41 Marble Hill Avenue, F Bronx,

3      New York?

4            MR. LIMA:  Yeah, that's--that's my

5      former address.

6            MR. KHODOROVSKY:  And when did you move

7      to your current address?

8            MR. LIMA:  It was about--it was about

9      two--I'm trying to remember when I renewed

10     my--it was--it was over two years ago.

11           MR. KHODOROVSKY:  Okay.  No, that's

12     fine.  I do want to ask you a couple of

13     questions about some things on this

14     statement.  Do you see here a transaction for

15     December 6, '07, $104.85 at Palmercash.com in

16     Boise, Idaho?

17           MR. LIMA:  Yes.

18           MR. KHODOROVSKY:  Did you make this

19     transaction?

20           MR. LIMA:  Yes.

21           MR. KHODOROVSKY:  What was it for?

22           MR. LIMA:  This is Christmas presents,

23     again.

24           MR. KHODOROVSKY:  What kind of items are

25     these?

1

2              MR. LIMA:  These are t-shirts.  These

3       are t-shirts with little slogans on them.

4       So, they are kind of just humorous t-shirts.

5              MR. KHODOROVSKY:  Okay.  That's fine.

6       Are you currently in possession of those

7       items?

8              MR. LIMA:  No.

9              MR. KHODOROVSKY:  Okay.  Let's flip the

10      page.  Okay, we're going to try to go over

11      these fast.  Again, do you see that you are

12      looking at the, again American Express Open

13      card, last four digits of the account number

14      being 1007, for a statement closing date

15      being March 3rd of '09.  Do you see that?

16             MR. LIMA:  Yes.

17             MR. KHODOROVSKY:  Okay.  Do you see on

18      that page a transaction for February 2nd,

19      '09, for $2,395.00 for Ocean Prime LLC?

20             MR. LIMA:  Yes.

21             MR. KHODOROVSKY:  Did you make this

22      transaction?

23             MR. LIMA:  I did.

24             MR. KHODOROVSKY:  Do you know what it is

25      for?

MR. LIMA:  This is my rent for my
apartment.

MR. KHODOROVSKY:  And Ocean Prime is
your landlord?

MR. LIMA:  Yes, Ocean Prime is the
landlord.

MR. KHODOROVSKY:  The reason I'm asking
you this question is because you see the card
describes it as business service.

MR. LIMA:  Yes.

MR. KHODOROVSKY:  That's--so that's what
I was trying to figure out what it was.

MR. LIMA:  I--I would interchange them,
depending on my situation, - - .

MR. KHODOROVSKY:  (Interposing) No, no,
I understand.  Again, let's flip the page.
Let's flip the page again.  No, no, flip the
page--keep flipping.

MR. LIMA:  Keep going?

MR. KHODOROVSKY:  Yes, keep going, I'll
tell you when to stop.  Hold on, I'm sorry.
I'm sorry, you were there, I apologize.
Actually, hold on.  I'm sorry--yes, no, no,
let's flip the page to the next page.  I'll

1

2          show you--I'll show you where I want you to

3          be.

4                    MR. LIMA:  Okay.

5                    MR. KHODOROVSKY:  Let me just direct

6          you.  I apologize.  Here's where I want you

7          to be.

8                    MR. LIMA:  Thank you.

9                    MR. KHODOROVSKY:  Do you see--do you see

10         that I'm showing you an American Express

11         credit card statement, last four digits of

12         the account being 2004 with a closing date of

13         March 16th, '07?  Let me show you, right

14         there.  Do you see that?

15                    MR. LIMA:  Yes.  I'm sorry.

16                    MR. KHODOROVSKY:  Okay.  I'm going to

17         ask you about some transactions on this page

18         here.  Do you see here a transaction for

19         $2,871.40 at Hardwire Designs of Fairfield,

20         New Jersey, on February 22nd--on February

21         21st, 2007?  Do you see that transaction?

22                    MR. LIMA:  Yes, I did--

23                    MR. KHODOROVSKY:  (Interposing) Did you

24         make this transaction?

25                    MR. LIMA:  -make that transaction.

1

2          MR. KHODOROVSKY:  And what was it for?

3          MR. LIMA:  That is for product.  That's

4     the cost of the goods sold for Pedro Lima

5     Design.

6          MR. KHODOROVSKY:  And are you currently

7     in possession of this product?

8          MR. LIMA:  No.

9          MR. KHODOROVSKY:  And you resold it all

10    to your clients?

11         MR. LIMA:  I did.

12         MR. KHODOROVSKY:  Okay.  Let's take a

13    look at the bottom, the last transaction

14    here, do you see a transaction for March 8th,

15    '07 for $246.52--

16         MR. LIMA:  (Interposing) Yes.

17         MR. KHODOROVSKY:  -at the Home Depot in

18    Long Island?

19         MR. LIMA:  Yes.

20         MR. KHODOROVSKY:  Did you make this

21    transaction?

22         MR. LIMA:  I did.

23         MR. KHODOROVSKY:  What did you buy?

24         MR. LIMA:  As well, this is the cost of

25    goods for a--for a client I was redoing their

2          master bathroom and actually their house.  I

3          was--

4                MR. KHODOROVSKY:  (Interposing) And are

5          you currently in possession of this product?

6                MR. LIMA:  No.

7                MR. KHODOROVSKY:  Okay.  In the middle

8          here, do you see a transaction for $322.63

9          for March 3rd, '07 at--I'm going to probably

10         mangle it, Lia Khali (phonetic) Hair Salon?

11               MR. LIMA:  Yes.

12               MR. KHODOROVSKY:  Did you make this

13         transaction?

14               MR. LIMA:  Yes.

15               MR. KHODOROVSKY:  What was it for?

16               MR. LIMA:  This is for my hair color.  I

17         used to have really very long hair, down my

18         back, and so I had--I tried to cut it

19         infrequently, but I would get it colored and

20         cut and--and do it - - .

21               MR. KHODOROVSKY:  How do you pronounce

22         the name of the salon?

23               MR. LIMA:  I think it was Lei Kali.

24               MR. KHODOROVSKY:  Okay.  I just--

25               MR. LIMA:  (Interposing) Lai Kali.

2              MR. KHODOROVSKY:  I said I'd mangle it.

3         Okay.  Can you flip the page?  Actually, can

4         you flip the page again?

5              MR. LIMA:  Mm hmm.

6              MR. KHODOROVSKY:  Okay.  Do you see

7         there we are on, where it says page three of

8         eight, for American Express statement, last

9         four digits being 2004, April 16t, '07?  Do

10        you see there--are you on page three of

11        eight?

12             MR. LIMA:  Yes.

13             MR. KHODOROVSKY:  Okay, great.  Great,

14        okay.  I'm going to ask you about a couple of

15        transactions here.  Do you see here listed a

16        transaction for $78.00 on March 23rd, '07 at

17        Toper Weans of Allerton, Texas?

18             MR. LIMA:  Yes.

19             MR. KHODOROVSKY:  Did you make this

20        transaction?

21             MR. LIMA:  I did, yes.

22             MR. KHODOROVSKY:  And what was it for?

23             MR. LIMA:  This is for cost of goods.

24        This is a foliage company.  They sell fake

25        plants basically.  This is--

1

2          MR. KHODOROVSKY:  (Interposing) Like

3      plastic plants?

4          MR. LIMA:  Yeah.  Nice--nice ones, but

5      yeah, they sell trees--

6          MR. KHODOROVSKY:  (Interposing) Are you

7      currently in possession of this product?

8          MR. LIMA:  No.

9          MR. KHODOROVSKY:  You resold it all to

10     your clients?

11         MR. LIMA:  Yes.

12         MR. KHODOROVSKY:  Okay.  Okay.  Let's

13     move on.  If you can, flip the page.

14     Actually--sorry, before we flip the page, the

15     very last line here, do you see on April

16     16th, '07, a transaction for $853.99--

17         MR. LIMA:  (Interposing) Mm hmm.

18         MR. KHODOROVSKY:  -to Turin Bank of Salt

19     Lake City, Utah?

20         MR. LIMA:  Yes.

21         MR. KHODOROVSKY:  What is that?

22         MR. LIMA:  That is--that's a credit card

23     payment.  I'm pretty sure it was a credit

24     card payment.  Those were--

25         MR. KHODOROVSKY:  (Interposing) So you

2              used one card to pay for another card?

3                    MR. LIMA:  Yes.

4                    MR. KHODOROVSKY:  Okay.  Let's--let's-

5              let's move on to the next page.  Do you see

6              here, I'm showing you what is page five of

7              eight, closing date May 16th, '07, for the

8              American Express Card for Pedro Lima, Pedro

9              Lima Design, last four digits of the account

10             number being 2004?

11                    MR. LIMA:  Yes.

12                    MR. KHODOROVSKY:  Okay.  I want to ask

13             you about some questions on this--on this.

14             Do you see the very top transaction here, for

15             $442.00 from a Henry Callan Fabrics of

16             Medford, Oregon?

17                    MR. LIMA:  Yes.

18                    MR. KHODOROVSKY:  Did you make this

19             transaction?

20                    MR. LIMA:  Yes.

21                    MR. KHODOROVSKY:  What was it for?

22                    MR. LIMA:  This is cost of goods.  Is

23             that a--should I just say cost of goods, or d

24             you want me to - - ?

25                    MR. KHODOROVSKY:  If you can just say

1

2          product of what you bought or--

3              MR. LIMA:  (Interposing) This is

4          textiles for a client's product.

5              MR. KHODOROVSKY:  Okay.

6              MR. LIMA:  Fabric to cover the chairs or

7          whatever that was.

8              MR. KHODOROVSKY:  Okay.  And do you

9          currently own the product?

10             MR. LIMA:  No.  No.

11             MR. KHODOROVSKY:  Okay.  And your client

12         would be in possession of it?

13             MR. LIMA:  Yes.

14             MR. KHODOROVSKY:  Okay.  Next--next

15         line, April 25th, '07, $432.50--$432.50,

16         Darna in Tempe, Arizona Furniture.  Did you

17         make this transaction?

18             MR. LIMA:  Yes.

19             MR. KHODOROVSKY:  What was it for?

20             MR. LIMA:  This is again cost of goods,

21         product for a client.  It's a bathroom

22         vanity.

23             MR. KHODOROVSKY:  And your client would

24         be in possession of it?

25             MR. LIMA:  They are--yes, they are.

1

2          MR. KHODOROVSKY:  Okay.  April 27th, '07,

3    do you see it there?  Jessed Gold Interior in

4    Corona, California, for $2,276.00, do you see

5    that transaction?

6          MR. LIMA:  Yes.

7          MR. KHODOROVSKY:  Did you make this

8    transaction?

9          MR. LIMA:  Yes.

10         MR. KHODOROVSKY:  What was it for?

11         MR. LIMA:  Those are draperies that I

12    made for--that were made for a client, again

13    cost of goods.

14         MR. KHODOROVSKY:  And your client is

15    currently in possession of them?

16         MR. LIMA:  Yes.

17         MR. KHODOROVSKY:  Okay.  The very last

18    transaction on this page, May 11th, '07,

19    $627.86 at the Artistic - - Paramus, New

20    Jersey, do you see that?

21         MR. LIMA:  Yes.

22         MR. KHODOROVSKY:  Did you make this

23    transaction?

24         MR. LIMA:  Yes.

25         MR. KHODOROVSKY:  What was it for?

1

2          MR. LIMA:  That is as well, cost of

3     goods for tiles and flooring for a client's

4     project and they are in possession of it, as

5     well.

6          MR. KHODOROVSKY:  Okay.  Let's flip the

7     page.  We are on page five of eight, for the

8     credit card for Pedro E. Lima, last four

9     digits of the account number being 2004,

10    closing date June 17th, '07, American

11    Express.  Do you see it?  Are we on that

12    page?

13         MR. LIMA:  Yes.

14         MR. KHODOROVSKY:  Okay, great.  You see

15    there some transactions on your card for

16    somebody Peter T. Biertzer.  Who is Peter T.

17    Biertzer?

18         MR. LIMA:  That's my boyfriend.

19         MR. KHODOROVSKY:  Okay.  And did you

20    share this card?

21         MR. LIMA:  Yes.  Yeah, he had a card--he

22    was authorized to make transactions on this

23    card.

24         MR. KHODOROVSKY:  And who would make

25    payments for these transactions?

2              MR. LIMA:  I made the payments, but he--

3              MR. KHODOROVSKY:  (Interposing) Did he

4        make any payments on it?

5              MR. LIMA:  He did.

6              MR. KHODOROVSKY:  Okay.  These are

7        obviously transactions he made, but to the

8        extent you know, I'm going to ask you about

9        them.  If you don't know, you can answer that

10       you don't know.  You see there a transaction

11       on May 18th, '07, CDW Government, Inc. of

12       Vernon Hills, Illinois, for $525.74?

13             MR. LIMA:  Yes.

14             MR. KHODOROVSKY:  Did you--did--do you

15       know what this transaction is about?

16             MR. LIMA:  Yes.

17             MR. KHODOROVSKY:  What is it about?

18             MR. LIMA:  This is for a computer for

19       my--for my office, for me.

20             MR. KHODOROVSKY:  Are you still in

21       possession of that computer?

22             MR. LIMA:  Yes, I am.

23             MR. KHODOROVSKY:  Okay.  And right below

24       that, do you see a transaction on May 25th,

25       '07, HP Home Store for $428.06?

1

2          MR. LIMA:  Yes.

3          MR. KHODOROVSKY:  Do you know what that

4     is for?  Again, if you don't know, you can

5     answer that.

6          MR. LIMA:  I don't know.

7          MR. KHODOROVSKY:  Okay.

8          MR. LIMA:  I don't know what it's for.

9          MR. KHODOROVSKY:  Okay.  Let's go down

10     to the last line on--on this page here.  May

11     31st, '07, transaction for $277.20, the Chief

12     New York.  Do you see that transaction?

13          MR. LIMA:  Yeah, I do, yes.

14          MR. KHODOROVSKY:  Do you know what it's

15     about?

16          MR. LIMA:  That's--that's--it's--it says

17     for internet marketing.  I think--I don't

18     think that was for my business.  I think that

19     was Argan Body, that Peter used the card to

20     pay for--whatever, pay per click or search

21     engine optimization, for Argan Body.

22          MR. KHODOROVSKY:  Okay.  I understand.

23     Can you flip the page?

24          MR. LIMA:  Sure.

25          MR. KHODOROVSKY:  I'm going to ask you

1

2  about a couple of transactions on this page.

3  Do you see here a--the credit card statement

4  for the card with the last four digits being

5  2004, closing date July 16th, '07, page three

6  of eight?

7        MR. LIMA:  Yes.

8        MR. KHODOROVSKY:  Okay.  Take a look at

9  the fifth transaction from the top, a July

10  5th, '07, $116.19 at Johnny Versace.  Do you

11  know what this transaction is about?

12        MR. LIMA:  Yes.

13        MR. KHODOROVSKY:  What is this?

14        MR. LIMA:  That is clothing for myself.

15        MR. KHODOROVSKY:  Are you currently in

16  possession of it?

17        MR. LIMA:  Yes.

18        MR. KHODOROVSKY:  Okay.  Next--next

19  transaction, the line after that, July 5th,

20  '07, Wilson's Leather in Central Valley New

21  York, $148.56, did you make this transaction?

22        MR. LIMA:  Yes.

23        MR. KHODOROVSKY:  What did you buy?

24        MR. LIMA:  That was a piece of luggage

25  for myself.

1

2          MR. KHODOROVSKY:  Are you currently in

3     possession of that piece of luggage?

4          MR. LIMA:  Yes.

5          MR. KHODOROVSKY:  Okay.  Again, if you

6     don't know an answer, to the question, you

7     can answer--

8          MR. LIMA:  (Interposing) I don't

9     remember if that one--I don't remember, but

10    I'm going to say yes, because I do have a few

11    pieces.  So, it is probably one of the ones

12    that I still have.

13         MR. KHODOROVSKY:  Okay.

14         MR. LIMA:  So, I'm going to say yes.

15         MR. KHODOROVSKY:  Let's--let's--let's

16    flip the page.  Do you see it says page five

17    of eight, at the top?

18         MR. LIMA:  Yes.

19         MR. KHODOROVSKY:  Flip the page again.

20         MR. LIMA:  Okay.

21         MR. KHODOROVSKY:  Okay.  Do you see

22    where it says page three of six?

23         MR. LIMA:  Yes.

24         MR. KHODOROVSKY:  On the top?  Just stop

25    there.  We are on the American Express credit

2          card statement of Pedro E. Lima, Pedro Lima

3          Design, last four digits of the account

4          number being 2004, closing date October 16th,

5          '07.  Do you see there a--a transaction, the

6          next to the last transaction for you, before

7          Mr. Biertzer, for $196.98, at Down, Inc. of

8          Grand Rapids, Michigan?

9               MR. LIMA:  Yes.

10              MR. KHODOROVSKY:  Did you make this

11         transaction?

12              MR. LIMA:  Yes.

13              MR. KHODOROVSKY:  Do you know what this

14         transaction is for?

15              MR. LIMA:  This is cost of goods sold

16         for a client--bedding, essentially--pillows

17         and--

18              MR. KHODOROVSKY:  (Interposing) Bedding?

19              MR. LIMA:  -bedspreads, yeah, for his

20         apartment.

21              MR. KHODOROVSKY:  And are you currently

22         in possession of this product?

23              MR. LIMA:  No, he--no.

24              MR. KHODOROVSKY:  The client is in

25         possession of it?

1

2          MR. LIMA:  The client is in possession,

3     yes.

4          MR. KHODOROVSKY:  Okay.  Let's flip the

5     page.  Let's flip the page again.  Do you see

6     there where it says closing date May 18th,

7     '08, on top?

8          MR. LIMA:  Yes.

9          MR. KHODOROVSKY:  Let's flip the page

10    again.  Okay, stop where it says page of

11    eight at the top.

12         MR. LIMA:  Okay.

13         MR. KHODOROVSKY:  Okay, good.  We are

14    looking at the, again the American Express

15    card, last four digits of the account number

16    being 2004, closing date June 17th, '08.

17    Let's look for transactions for you, at the

18    bottom of the page.  Do you see there a

19    transaction for $1,314.14 on May 29th, 2008

20    at the Robert Allen in Massachusetts?

21         MR. LIMA:  What is the--thirteen

22    thousand--the one $1,314.00?

23         MR. KHODOROVSKY:  $1,314. 14.

24         MR. LIMA:  Yes.

25         MR. KHODOROVSKY:  Next to last, at the

Robert Allen, do you see that?

MR. LIMA:  Yes.

MR. KHODOROVSKY:  Did you make this

transaction?

MR. LIMA:  Yes.  This is a cost of goods

sold for a client and they--they are in

possession of that product.

MR. KHODOROVSKY:  Okay, the client is in

possession?

MR. LIMA:  Yes.

MR. KHODOROVSKY:  What kind of product

was it?

MR. LIMA:  A fabric.

MR. KHODOROVSKY:  Okay.  The last

transaction on this page, do you see there a

charge on June 6, '08, $561.18 for--for Air

Canada in Calgary?

MR. LIMA:  Yes.

MR. KHODOROVSKY:  Did you make this

transaction?

MR. LIMA:  Yes.

MR. KHODOROVSKY:  What was it for?

MR. LIMA:  This was a conference that I

went to for ASID.

1

2          MR. KHODOROVSKY:  In--in Canada?

3          MR. LIMA:  In Canada.

4          MR. KHODOROVSKY:  Were you reimbursed

5      for this trip?

6          MR. LIMA:  I was reimbursed in full for

7      that, yes.

8          MR. KHODOROVSKY:  You were reimbursed,

9      in full, for the $561.00 ticket?

10         MR. LIMA:  Yes, uh huh.

11         MR. KHODOROVSKY:  Okay.  Can you flip

12     the page please?  We are--we are on page

13     three of six, statement for the closing date

14     of August 17th, '08 for American Express card

15     for Pedro Lima, Pedro Lima Design, last four

16     digits of the account number being 2004.  Do

17     you see there a charge, on that page, second

18     line, of $600.00 Canadian dollars, for Hyatt

19     Regency in Calgary, Alberta?

20         MR. LIMA:  Yes.

21         MR. KHODOROVSKY:  Did you make this

22     transaction?

23         MR. LIMA:  Yes.

24         MR. KHODOROVSKY:  What was it for?

25         MR. LIMA:  This is the hotel room for

2          the trip to Calgary for ASID.  And again, I

3          was reimbursed the $601.65.

4               MR. KHODOROVSKY:  Okay.  Let's--let's

5          look to the very bottom here.  You see here a

6          transaction on August 15th, '08, for $25.00

7          on Craig's List?

8               MR. LIMA:  Craig's List?  Okay.

9               MR. KHODOROVSKY:  And what was it for?

10              MR. LIMA:  - - .

11              MR. KHODOROVSKY:  If you don't remember,

12         then you can just say--

13              MR. LIMA:  (Interposing) No, I might.  I

14         might.  I want to make sure.  This is for a

15         job posting that I placed for Pedro Lima

16         Design.

17              MR. KHODOROVSKY:  So, you would hire

18         employees from Craig's List?

19              MR. LIMA:  Yes, I--I did.

20              MR. KHODOROVSKY:  Okay.  I understand.

21         Staying on the same page, do you see up top

22         there, just keep moving up, do you see there

23         a charge on August 10th, '08 for $230.30 at

24         Paper Presentation, in New York?

25              MR. LIMA:  Yes.

1

2          MR. KHODOROVSKY:  Did you make this

3     transaction?

4          MR. LIMA:  Yes.

5          MR. KHODOROVSKY:  What is that for?

6          MR. LIMA:  It is for--this is for Argan

7     Body.  This was for--wait, no.  This was for;

8     I'm sorry; this one was for a--essentially

9     for marketing and advertising for Pedro Lima

10    Design.  I had created a gift bag, for the

11    Grammies, so and I got--made certificates for

12    myself and put them in the gift--

13         MR. KHODOROVSKY:  (Interposing) So, you

14    gave out gift bags at the Grammy Awards?

15         MR. LIMA:  It was--it wasn't the awards.

16    It was the Grammy, it was Andre Agostine, it

17    was an event that was sponsored by the

18    Grammies in Long Island.  And so, I made--

19         MR. KHODOROVSKY:  (Interposing)

20    Involving Andre Agostine?

21         MR. LIMA:  Yes.

22         MR. KHODOROVSKY:  And you made gift bags

23    for that event?

24         MR. LIMA:  I just--I just put a gift

25    certificate into the--

1

2          MR. KHODOROVSKY:  (Interposing) Into the

3     gift bags?

4          MR. LIMA:  -gift bags, so this was just

5     the cost of the--

6          MR. KHODOROVSKY:  (Interposing) Okay.

7     So, Andre Agostine got your certificate?

8          MR. LIMA:  He got my certificate, yes.

9          MR. KHODOROVSKY:  Okay.

10          MR. LIMA:  But he didn't call me.

11          MR. KHODOROVSKY:  Okay.  Okay, and I

12     understand.  Let's--let's flip the page.  I

13     apologize.  We are on--do you see we are on

14     page three of five for the same credit card,

15     the last four digits of the account being

16     2004, statement with a closing date of

17     September 16th, '08?

18          MR. LIMA:  Yes.

19          MR. KHODOROVSKY:  Do you see there a

20     charge for--on August 26th, '08, for

21     $1,273.60 for American Century in North

22     Carolina?

23          MR. LIMA:  Yes.

24          MR. KHODOROVSKY:  What is that for?

25     Well, first of all, did you make this

transaction?

MR. LIMA:  Yeah--yes.

MR. KHODOROVSKY:  And what was it for,
if you remember?

MR. LIMA:  American Century--

MR. KHODOROVSKY:  (Interposing) If it
helps you, it says - - furniture home store.

MR. LIMA:  I know.  I bought a sofa at
one point.  I know it wasn't American--I
don't remember doing business with a company
called American Century.  But, this is--this
is cost of goods sold.  I bought a sofa, it
wasn't--

MR. KHODOROVSKY:  (Interposing) Was it
for you or was it for a client?

MR. LIMA:  I bought a sofa for myself,
that's one of the only things that I bought
for myself.  So, I'm assuming this is for a
client, for a product that they are in
possession of.

MR. KHODOROVSKY:  You assume, but you--
you--

MR. LIMA:  (Interposing) I don't--I
don't know for sure.

1

2        MR. KHODOROVSKY:  Okay.

3        MR. LIMA:  I'm sorry; I don't remember.

4        MR. KHODOROVSKY:  No, I understand.  I

5   understand.  That's fine.  Let me ask you,

6   briefly, about a transaction right above it.

7   It says August 25th, '08, Yahoo, Pedro Lima

8   DS $11.95.  Did you make this transaction?

9        MR. LIMA:  Yes.

10       MR. KHODOROVSKY:  What was that for?

11       MR. LIMA:  This is for my--the website

12   and e-mail--I think it was a maintenance fee

13   for that website.

14       MR. KHODOROVSKY:  They maintained the

15   yahoo and they maintain your--your corporate

16   e-mail address?

17       MR. LIMA:  Yes.

18       MR. KHODOROVSKY:  I understand.  Let's--

19   let's flip the page.  Okay.  Do you see we

20   are here on a statement with a closing date

21   of January 29th, '09, for the same credit

22   card, last four digits being 2004?

23       MR. LIMA:  Yes.

24       MR. KHODOROVSKY:  Where it says page

25   three of eight, do you see that?

1

2      MR. LIMA:  Yes.

3      MR. KHODOROVSKY:  Okay.  Do you see

4  there a transaction on January 1st, '09, at

5  the Apple Computer, Inc. in New York, New

6  York for $480.97?  Middle of the page.

7      MR. LIMA:  I'm sorry; Apple Computer--

8      MR. KHODOROVSKY:  (Interposing) Inc.

9      MR. LIMA:  $480.00, okay, yes.

10      MR. KHODOROVSKY:  Did you make this

11  transaction?

12      MR. LIMA:  I did.

13      MR. KHODOROVSKY:  What--what is this

14  transaction for?

15      MR. LIMA:  This is for--this is for my

16  computer, my personal computer.  I use it for

17  business.  I use it for everything myself.

18      MR. KHODOROVSKY:  Is this a computer

19  that you bought?

20      MR. LIMA:  This is a computer--no, it's

21  not a computer, because I think it was more

22  than that, unless, I don't remember.  It's

23  related to the computer; whether it was a

24  program or a--something that I needed for it,

25  I don't remember.  But this is--

MR. KHODOROVSKY:  (Interposing) Are you
currently in possession of that item?

MR. LIMA:  Yes.

MR. KHODOROVSKY:  Okay.  On the same
page, let's move up a little bit.  You see a
transaction there for $357.47 at a company
called, I'm probably going to mispronounce
its name,--

MR. LIMA:  (Interposing) Dyks.

MR. KHODOROVSKY:  -D-Y-K-S, Dyks--

MR. LIMA:  Dyks Lumber.

MR. KHODOROVSKY:  In Tolman--in Tolman,
New York, construction material.  Do you see
that?

MR. LIMA:  Yes.

MR. KHODOROVSKY:  Did you make this
transaction?

MR. LIMA:  Yes.

MR. KHODOROVSKY:  What did you buy?

MR. LIMA:  This is cost of goods for a
client.

MR. KHODOROVSKY:  You bought lumber for
a client?

MR. LIMA:  Millwork, yeah, moldings, I

think it was the moldings--either baseboard

or the crown molding, that I purchased for

them.  They are in possession of it.

MR. KHODOROVSKY:  Okay.  Let's--let's

flip the page.  Okay, we are on the same

credit card, last four digits of the account

number being 2004, closing date being April

30th, '09.  Do you see that, on this page, a

transaction for $140.00 for you at American

Apparel on April 17th, '09?

MR. LIMA:  Yes.

MR. KHODOROVSKY:  Did you make this

transaction?

MR. LIMA:  Yes.

MR. KHODOROVSKY:  What did you buy?

MR. LIMA:  This is for clothing.

MR. KHODOROVSKY:  For you personally?

MR. LIMA:  Partially for me, partially--

I don't know if you would call it a gift or--

this was for my employee--

MR. KHODOROVSKY:  (Interposing) For an

employee?

MR. LIMA:  -some of the--two of these

things--one of the--maybe the solid--I don't

1

2      remember if it's the solid rib vest and the

3      headband was for him.

4              MR. KHODOROVSKY:  Okay.

5              MR. LIMA:  As like a--

6              MR. KHODOROVSKY:  (Interposing) As a

7      gift?

8              MR. LIMA:  As an--as a gift, yes.

9              MR. KHODOROVSKY:  Okay.  And the

10     clothing that you bought for yourself, are

11     you in possession of it?

12             MR. LIMA:  Yeah, yes.

13             MR. KHODOROVSKY:  Okay.  By the way--

14     actually switching gears, are there any

15     unpaid wages that Pedro Lima Design or Urban

16     Stone would owe to any employees?

17             MR. LIMA:  No.

18             MR. KHODOROVSKY:  Okay, let's flip the

19     page.  Okay.  We're looking at the, again

20     American Express credit card statement

21     closing date June 30th, '09, last four digits

22     of the account number being 2004, page three

23     of eight.  Do you see that?

24             MR. LIMA:  Yes.

25             MR. KHODOROVSKY:  Are you there?  Okay,

2          great.  I want to ask you, do you see the top

3          most transaction there?

4               MR. LIMA:  Mm hmm.

5               MR. KHODOROVSKY:  Broadway Fabrics in

6          New York on June 3rd of '09 for $200.00?

7               MR. LIMA:  Yes.

8               MR. KHODOROVSKY:  Did you make this

9          transaction?

10               MR. LIMA:  Yes.

11               MR. KHODOROVSKY:  It says it's a sewing

12          machine.  Did you buy a sewing machine?

13               MR. LIMA:  No.  This is for; again this

14          is cost of goods sold.  This is fabric for a

15          client for draperies.

16               MR. KHODOROVSKY:  Mm hmm.

17               MR. LIMA:  And they also made the

18          draperies.  So, that may be why they say

19          sewing machine, because it might be workroom

20          labor.

21               MR. KHODOROVSKY:  And they--so you--so

22          you don't have your own sewing machine?

23               MR. LIMA:  No, I don't own a sewing

24          machine.  That's not a--that's a--either

25          labor or the fabric.

1

2          MR. KHODOROVSKY:  No, I understand.

3          MR. LIMA:  Okay.

4          MR. KHODOROVSKY:  I understand.  That's

5      fine.  Okay.  Right be--you see that there is

6      a Starbucks charge, and below the Starbucks

7      there is a charge for $192.58 on June 5th of

8      '09 in St. Paul for, I guess - - logistics?

9          MR. LIMA:  Yes.

10          MR. KHODOROVSKY:  Did you make this

11      transaction?

12          MR. LIMA:  Yes.

13          MR. KHODOROVSKY:  What was it for?

14          MR. LIMA:  I don't remember.  Can I

15      guess?

16          MR. KHODOROVSKY:  Don't guess.

17          MR. LIMA:  Okay.

18          MR. KHODOROVSKY:  Don't guess.  Don't

19      guess.

20          MR. LIMA:  No, I don't remember then.  I

21      made the transaction.  I don't remember what

22      it was for.

23          MR. KHODOROVSKY:  Okay.  Let's flip the

24      page.  Okay.  So, let's stay on the page

25      where it says page three of six, on top.

2       Also on the American Express card, for Pedro

3       Lima, Pedro Lima Design, account number last

4       four digits being 2004, closing date July

5       30th, of '09.  Do you see that?

6           MR. LIMA:  Yes.

7           MR. KHODOROVSKY:  Okay, great.  Do you

8       see there a charge for $368.72 on July 19th,

9       '09 at, it says Health Netherlands, FD.

10          MR. LIMA:  Yes.

11          MR. KHODOROVSKY:  Did you make this

12      transaction?

13          MR. LIMA:  Yes.

14          MR. KHODOROVSKY:  What was it for?

15          MR. LIMA:  This is for airfare for a

16      trip to Cincinnati that was made as a

17      training for ASID.  And they did reimburse me

18      for that transaction.

19          MR. KHODOROVSKY:  And what about the

20      transaction below, $583.88, were you

21      reimbursed for that too?

22          MR. LIMA:  I was reimbursed.  It was the

23      same trip, as well the--the one following, if

24      you want me--

25          MR. KHODOROVSKY:  And the one following,

on July 20th, 2009 for $544.08 you were

reimbursed for that too?

MR. LIMA:  I was, yes.

MR. KHODOROVSKY:  And it's all for the

lodging in--in Cincinnati?

MR. LIMA:  Yes.  Can I explain a little

further why there are--

MR. KHODOROVSKY:  (Interposing) No,

that--that's fine.

MR. LIMA:  Okay.

MR. KHODOROVSKY:  Because I just want to

know what the transaction is about and if you

were reimbursed.  That's all.

MR. LIMA:  Yes, I was reimbursed.

MR. KHODOROVSKY:  That's fine.  Let's

flip the page.  Okay, stop here.  Do you see

page three of six, statement with a closing

date of August 21st, '07, for American

Express card with the last four digits 1008,

for Pedro E. Lima?

MR. LIMA:  Yes.

MR. KHODOROVSKY:  Okay.  Do you see

there a transaction, fourth from the top, for

$688.18 at NYTNTNO--NY Teno, New York, on

1

2          August 12^th, '07 for $688.18?

3                    MR. LIMA:  Yes.

4                    MR. KHODOROVSKY:  Did you make this

5          transaction?

6                    MR. LIMA:  Yes, I did.

7                    MR. KHODOROVSKY:  What is that?

8                    MR. LIMA:  This is a ring.  This was a

9          present.

10                   MR. KHODOROVSKY:  Go ahead.

11                   MR. LIMA:  This was a ring for Peter, my

12         boyfriend.

13                   MR. KHODOROVSKY:  And who is in

14         possession of it now?

15                   MR. LIMA:  He is in possession of it.

16                   MR. KHODOROVSKY:  You're not in

17         possession of it?

18                   MR. LIMA:  No.

19                   MR. KHODOROVSKY:  Okay.  Let's--let's

20         flip the page.  Let's flip the page again.

21                   MR. LIMA:  Do you think we could take a

22         break for a minute?

23                   MR. KHODOROVSKY:  Oh certainly.  If you

24         want to take a break, definitely, just tell

25         me when you need a break and we can take a

2        break.  Hold on--hold on, I need to get off

3        the record.  We are off the record.  The time

4        is 1:02 p.m. on August 27th, 2010.

5              [OFF THE RECORD]

6              [ON THE RECORD]

7              MR. KHODOROVSKY:  We are back on the

8        record at the 2004 Examination of Pedro Lima.

9        The time is 1:20 p.m. on the 27th of August

10       2010.  Okay.  Before we went off the record,

11       I was asking you about one of the American

12       Express accounts.  And we are now looking--

13       you now should be looking at American Express

14       account for Pedro E. Lima, last four digits

15       of the account number being 1008.  You're

16       looking at page three of eight.  Are you

17       there?

18             MR. LIMA:  Yes.

19             MR. KHODOROVSKY:  Great.  Okay.  I

20       wanted to ask you, you see there a

21       transaction on December 19th, '07 at Comfort

22       House in New Jersey, $137.94?

23             MR. LIMA:  Mm hmm.  Yes.

24             MR. KHODOROVSKY:  Did you make this

25       transaction?

1

2          MR. LIMA:  Yes.

3          MR. KHODOROVSKY:  What was it for?

4          MR. LIMA:  This is for--actually this is

5     for a catalog from a company that sells

6     product for my company.  I had to purchase

7     this.

8          MR. KHODOROVSKY:  You had to purchase

9     their catalog?

10         MR. LIMA:  Yes.

11         MR. KHODOROVSKY:  Are you in possession

12    of the catalog?

13         MR. LIMA:  No.

14         MR. KHODOROVSKY:  So, what happened to

15    it?  You--

16         MR. LIMA:  (Interposing) I threw out all

17    my catalogs when I closed the business.  I

18    had a huge library so it's--

19         MR. KHODOROVSKY:  So the entire library

20    of the business was thrown out?

21         MR. LIMA:  Yeah.  Yes.

22         MR. KHODOROVSKY:  What kind of a library

23    did the business keep?

24         MR. LIMA:  I had stone samples and

25    fabrics and furniture binders.

2              MR. KHODOROVSKY:  And that--that's for

3         Urban Stone?

4              MR. LIMA:  No, for Pedro Lima Design.

5              MR. KHODOROVSKY:  And so you--you said

6         you closed it out sometime in the fall of

7         last year?

8              MR. LIMA:  Yes.

9              MR. KHODOROVSKY:  And when you closed it

10        down, you threw out all this stuff?

11             MR. LIMA:  Not my records, or anything

12        like that.  I threw out--yeah.

13             MR. KHODOROVSKY:  You mean the samples,

14        the books--

15             MR. LIMA:  (Interposing) Yes.

16             MR. KHODOROVSKY:  -the library

17        materials?

18             MR. LIMA:  Yes.

19             MR. KHODOROVSKY:  Okay.  So, you are not

20        currently in possession of this catalog?

21             MR. LIMA:  No.

22             MR. KHODOROVSKY:  Okay.  Okay.  Let's

23        flip the page.  Like I said, we're--I'm

24        trying to go faster.  Let's flip the page.

25        Okay, let's stop--stop on this page.  You see

there a transaction with a closing date of

February 22nd, '08; page five of eight,

American Express with the last four digits of

the account number being 1008?

MR. LIMA:  Yes.

MR. KHODOROVSKY:  Okay, great.  Great.

Let me ask you this.  Do you see there a

transaction in--unfortunately the first part

- - got cut off, but it's in large font, New

York at Trader Joe's, for $168.96?

MR. LIMA:  Yes.

MR. KHODOROVSKY:  Did you make this

transaction?

MR. LIMA:  I did.

MR. KHODOROVSKY:  Let me ask you a

question.  At the time--in this time, were

you living in Manhattan or in the Bronx?

MR. LIMA:  I don't remember.

MR. KHODOROVSKY:  In early '08, where

were you living?

MR. LIMA:  I was in--still in the Bronx.

MR. KHODOROVSKY:  And so you would--you

would drive up to Larchmont to go to Trader

Joe's?

2              MR. LIMA:  Yes.  I had the car at that

3        time.

4              MR. KHODOROVSKY:  Okay.  Okay.

5              MR. LIMA:  And my gym was close by also,

6        so, if I went to there, I just did the same

7        thing--

8              MR. KHODOROVSKY:  (Interposing) And your

9        gym was also in Larchmont?

10             MR. LIMA:  Yes.

11             MR. KHODOROVSKY:  Okay.  I understand.

12       Let's go down a few lines.  Do you see there

13       a transaction for $334.50 to Shoenfeld,

14       Plymouth, New York, the Chorus Line, February

15       9th?

16             MR. LIMA:  This is on the same page?

17             MR. KHODOROVSKY:  Yes.  Your counsel is

18       showing you.

19             MR. LIMA:  Oh, okay.

20             MR. KHODOROVSKY:  It's below that Trader

21       Joe's transaction.

22             MR. LIMA:  Yes, I see it.

23             MR. KHODOROVSKY:  Do you see that?

24             MR. LIMA:  Yes.

25             MR. KHODOROVSKY:  Did you make this

transaction?

MR. LIMA:  Yes.

MR. KHODOROVSKY:  What was it for?

MR. LIMA:  This is for theater tickets
for myself and my boyfriend to see--

MR. KHODOROVSKY:  (Interposing) The
Chorus Line.

MR. LIMA:  -a musical, yes.

MR. KHODOROVSKY:  Okay.  Great.  Okay.
Let's go down a couple of lines.  Do you see
there a $260.00 transaction?

MR. LIMA:  Yes.

MR. KHODOROVSKY:  For Mr. Mark Lemchem?

MR. LIMA:  Yes.

MR. KHODOROVSKY:  Let me ask you a
question.  Was mister--we talked before about
Mr. Lemchem.  Was he your dentist or your
lawyer?

MR. LIMA:  He--I'm so sorry; he is--he
is Peter's dentist.  Peter had braces for ten
years.  This is--

MR. KHODOROVSKY:  (Interposing) So, he
is not a lawyer, he is a dentist?

MR. LIMA:  This is an orthodontist.  No,

my--my lawyer's name is Mark--I have a really

bad memory, but my lawyer's name is Mark.

So, Mr. Lemchem--I never hear--yes, this is

the dentist.

MR. KHODOROVSKY:  So, he's not a lawyer?

MR. LIMA:  He's not a lawyer.  I'm

sorry.

MR. KHODOROVSKY:  Okay.

MR. LIMA:  No.

MR. KHODOROVSKY:  Okay, we'll let's

continue.  Okay.  Let's look at the last line

on this page here.  Do you see a transaction

for $43.98 at ftd.com?

MR. LIMA:  Yes.

MR. KHODOROVSKY:  Did you make this

transaction?

MR. LIMA:  Yes.

MR. KHODOROVSKY:  Was it flowers?

MR. LIMA:  This was for flowers, yes.

MR. KHODOROVSKY:  As a gift for

somebody?

MR. LIMA:  Yes.

MR. KHODOROVSKY:  Okay.  Let's move on.

Let's flip the page.  Let's flip the page

again.  Let's flip the page again.  Go to the

next page--this page, page three of eight.

Okay.  Stay on page three of eight.  This is

the, again the American Express card with the

last four digits of the account being 1008,

closing date of April 22nd, '08.  Do you see

there a transaction at Fife and Greenberg,

Elle, New York for $500.00?

MR. LIMA:  Yes.

MR. KHODOROVSKY:  Did you make this

transaction?

MR. LIMA:  Yes.  I don't remember what

this is for though.

MR. KHODOROVSKY:  Okay.  Let's keep

going down a little bit.  Do you see a

transaction down there for $1.00, Pedro Lima

Design, New York, New York?

MR. LIMA:  Yes.

MR. KHODOROVSKY:  Did you make this

transaction?

MR. LIMA:  Yes.

MR. KHODOROVSKY:  Why did you charge

your own business on your--this transaction

to yourself?

1

2          MR. LIMA:  I don't know.  I don't

3     remember.

4          MR. KHODOROVSKY:  Okay.  Let's flip the

5     page.  No, you can flip the page.

6          MR. LIMA:  I'm just thinking.  It might

7     be because of a credit card terminal.  I

8     might have been testing a credit card

9     terminal.

10          MR. KHODOROVSKY:  Oh, using it at your

11     business, having your credit--people being

12     able to swipe a credit card at your office?

13          MR. LIMA:  Yes, because I took credit

14     cards on occasion.  So, that's the only thing

15     I can think of why I would do that.

16          MR. KHODOROVSKY:  And so your office

17     would have a credit card machine--merchant

18     machine?

19          MR. LIMA:  I did have one for a while,

20     and then I just did PayPal.  But I did have

21     one for a while.

22          MR. KHODOROVSKY:  Okay.  Let's move to--

23     do you see where it says page five of eight?

24          MR. LIMA:  Yes.

25          MR. KHODOROVSKY:  Closing date for the

statement being April 22nd, '08, the last

four digits of the card being 1008, do you

see that?

MR. LIMA:  Mm hmm.  Yes.

MR. KHODOROVSKY:  Do you see there a

charge for $54.17 at Best Buy?

MR. LIMA:  Yes.

MR. KHODOROVSKY:  On April 19th, '08?

MR. LIMA:  Yes.

MR. KHODOROVSKY:  Okay.  Did you make

this transaction?

MR. LIMA:  Yes.

MR. KHODOROVSKY:  What did you buy?

MR. LIMA:  This was for computer--things

for my computer, for my office.

MR. KHODOROVSKY:  Mm hmm.  Okay.  Let's

flip the page.

MR. LIMA:  This is about when I moved.

MR. KHODOROVSKY:  Okay.  No, I

understand.  Don't--just - - I don't have any

questions.  Until I ask a question, don't - -

.  Okay.  Stay there.  Stay on the page that

says page three of four.  Last four digits of

the account number being 1008, statement with

2          a closing date of May 22nd, '08.  I'm going

3          to ask you for a charge from Mr. Biertzer.

4          Answer to the best of your knowledge.  You

5          see there is a charge, the last--very last

6          line, $1,347.91.  PayPal Aragan Boutique in

7          California.  Do you know what this

8          transaction is about?

9               MR. LIMA:  This is--this is--all I can

10         say is that it is related to Peter's company.

11         I don't know if this is for product inventory

12         for him.  That's the only thing I can think

13         of, because his company was Argan Body.

14              MR. KHODOROVSKY:  But--but do you know--

15         but can you say right now, sitting here

16         today, what this transaction is about?

17              MR. LIMA:  No, I couldn't.

18              MR. KHODOROVSKY:  Okay.  Let's flip the

19         page then.  And we can flip the page again.

20         And again.  Okay, staying also on that--right

21         here.  Statement with a closing date of July

22         22nd, '08, American Express card for Pedro

23         Lima, last four digits of the account number

24         being 1008 closing date July 22nd, '08, page

25         three of seven.  Okay, let's look at the

1

2      bottom there.  This is a--these are

3      transactions again from Mr. Biertzer, and

4      answer to the best of your knowledge.  Do you

5      see there a transaction for $447.18, also

6      PayPal Argan Boutique?

7            MR. LIMA:  Yes.

8            MR. KHODOROVSKY:  Do you know what this

9      transaction was about?

10           MR. LIMA:  Again, I am not--

11           MR. KHODOROVSKY:  (Interposing) Okay.

12           MR. LIMA:  -certain.

13           MR. KHODOROVSKY:  So--so you don't know?

14           MR. LIMA:  I do not know.

15           MR. KHODOROVSKY:  Okay.  Let's flip the

16     page.  Actually let's go to the next page.

17     Okay, stay there.  Actually, I'm sorry; flip

18     the page.  I apologize.  And okay.  Page

19     three of five right--do you see that?  Okay.

20     For transactions from Mr. Biertzer.

21           MR. LIMA:  Okay.

22           MR. KHODOROVSKY:  You see again, on the

23     last line there is a transaction, PayPal

24     again, Argan Boutique, $1,085.61.  Do you

25     know what this transaction is?

1

2      MR. LIMA:  This--it's--it just--it is

3      related to Argan Body.  But again, I don't--I

4      don't know.

5      MR. KHODOROVSKY:  Okay, let's flip the

6      page then.

7      MR. LIMA:  No, I don't know.

8      MR. KHODOROVSKY:  Okay.  You see there

9      when the credit card, the American Express,

10     last four digits of the account number being

11     1008, closing date April 21st,'08, page three

12     of five.  Do you see?  Are you there?

13     MR. LIMA:  Mm hmm.  Yes.

14     MR. KHODOROVSKY:  Excellent.  Do you see

15     there a transaction for $157.82 at Century

16     21, in New York, New York?

17     MR. LIMA:  Yes.

18     MR. KHODOROVSKY:  Did you make this

19     transaction?

20     MR. LIMA:  Yes, this was for clothing

21     for myself.

22     MR. KHODOROVSKY:  And the transaction

23     below, $641.78, did you make this

24     transaction?

25     MR. LIMA:  Yes.

2              MR. KHODOROVSKY:  And what was that for?

3              MR. LIMA:  This is also for clothing.

4              MR. KHODOROVSKY:  Are you in possession

5         of that clothing?

6              MR. LIMA:  Yes.

7              MR. KHODOROVSKY:  Okay.  Let's flip the

8         page.  Okay.  We are--I'm at page five of

9         five of a credit card statement closing date

10        October 22nd--October 21st, '08, last four

11        digits of the account number being 1008.

12        Let's look at the third line from the bottom.

13        Do you see there a transaction for $611.40 at

14        Geico, in Washington, D.C.?

15             MR. LIMA:  Yes.

16             MR. KHODOROVSKY:  Did you make this

17        transaction?

18             MR. LIMA:  Yes.

19             MR. KHODOROVSKY:  What was it for?

20             MR. LIMA:  This is for insurance for my

21        car.

22             MR. KHODOROVSKY:  The last BMW you

23        leased.

24             MR. LIMA:  Yes.

25             MR. KHODOROVSKY:  Okay.  Let's flip the

2        page then.  And flip the page again.  And um

3        let's move on to--do you see a statement with

4        a closing date of December 22nd, '08, for

5        again, American Express card for you--last

6        four digits of the account being 1008. Do you

7        see it--where we are?

8               MR. LIMA:  Yes.

9               MR. KHODOROVSKY:  Okay.  I want to ask

10       you about a transaction for $59.97 for

11       Cypress Plumbing and heating Brooklyn.  Did

12       you make this transaction?

13              MR. LIMA:  Yes.

14              MR. KHODOROVSKY:  What was it for?

15              MR. LIMA:  This is for cost of goods--

16       plumbing for a client's project, and they are

17       in possession of it.

18              MR. KHODOROVSKY:  Okay.  Let's flip the

19       page.  Okay.  We are now on page three of

20       five, statement for the American Express

21       card, with the last digits being 1,008,

22       December 22nd, '08, the closing date--do you

23       see there, a transaction for--for--on

24       December 15th '08, for $109.91, by dig.com in

25       Edison, New Jersey.

MR. LIMA:  Yes.

MR. KHODOROVSKY:  And did you make this transaction?

MR. LIMA:  Yes.

MR. KHODOROVSKY:  What was this for?

MR. LIMA:  I don't--I don't remember.

MR. KHODOROVSKY:  Okay.  Staying on the same page, and I'm going to ask you about some transactions from Mr. Biertzer, again, if you don't know the answer, you can just answer that you don't know.  Do you see there is a transition there on November 21st, '08-- November 24th, '08, at air tran airways, in Atlanta, for $251.00 to Milwaukee, Wisconsin.

MR. LIMA:  Yes.

MR. KHODOROVSKY:  Did--did--do you know what this transaction is about?

MR. LIMA:  This is--yes, this is the airfare for Peter to take the--take a trip to see his family, in Wisconsin.  So, it's airfare for Peter.

MR. KHODOROVSKY:  And he--this was him-- for him personally?

MR. LIMA:  This is a personal--yes.

2              MR. KHODOROVSKY:  Okay.  This is not

3        related to any ASID business?

4              MR. LIMA:  No, this is personal.

5              MR. KHODOROVSKY:  Okay.  Okay.  Let's

6        flip the page.  And flip the page again.

7        Stop, where--where it's 1,008--American

8        Express card, last four digits 1,008, closing

9        date February 20th, '09, page one of ten.

10       Are you there?

11             MR. LIMA:  Yes.

12             MR. KHODOROVSKY:  Okay.  Do you see

13       there a transaction of $125.81 cents, on

14       February 14th of '09 at Jay Crew?

15             MR. LIMA:  Yes.

16             MR. KHODOROVSKY:  Did you make this

17       transaction?

18             MR. LIMA:  Yes.

19             MR. KHODOROVSKY:  What did you buy?

20             MR. LIMA:  This is clothing for Peter,

21       actually.

22             MR. KHODOROVSKY:  To the best of your

23       knowledge, is he in possession of it?

24             MR. LIMA:  He is, yes.

25             MR. KHODOROVSKY:  Okay.  And right below

that, do you see a transaction, American

Apparel, on February 17th, '09, for $106.00?

MR. LIMA:  Yes.

MR. KHODOROVSKY:  And did you make this

transaction?

MR. LIMA:  Yes.

MR. KHODOROVSKY:  And what is this?

MR. LIMA:  This is also clothing.  As I

look at the date, it is possible they were

presents.

MR. KHODOROVSKY:  And are you in

possession of it?

MR. LIMA:  I'm--yes.

MR. KHODOROVSKY:  Okay.  Let's flip the

page.  Okay.  Next page, again this is the

same statement, same closing date, same card.

It is page three of ten.  Do you see that?

MR. LIMA:  Yes.

MR. KHODOROVSKY:  Okay.  I want to ask

you about a--a transaction of interest to me

here.  You see there a transaction on this

page, on January 3rd, '09, from Mr. Biertzer,

$138.00 at I-Bob's Inc, in Minneapolis.

MR. LIMA:  Yes.

1

MR. KHODOROVSKY:  Do you know anything
about this transaction?

MR. LIMA:  Yes.  This is for glasses for
Peter.  We--he had purchased them online and
then he had the lenses changed, because they
were--he liked the style of the frame, but
then he just changed it locally.

MR. KHODOROVSKY:  Do you think he is
currently in possession of those glasses?

MR. LIMA:  He is, in possession, yes.

MR. KHODOROVSKY:  Okay, let's flip the
page.  Okay.  We are on the American Express
statement for Pedro A. Lima.  The last four
digits of the account number being 1008.
Page three of seven, closing date March 23,
'09.  These are transactions from Mr.
Biertzer.  Again, answer to the best of your
knowledge.  There is a charge there, on
February 26th, '09, for $69.91 cents, for u-
haul rental truck--for u-haul rental; sorry.
Is that one you--do you know what that's
about?

MR. LIMA:  February 26th.  Yes, this is
for a storage locker that I--that I had.  I

2    think this is--let me just make sure; I'm - -

3    .  There's--there's no other charges for

4    this.  This--the monthly--we had a storage

5    locker, and I'm ---and I, maybe I should say

6    I don't know exactly what--

7              MR. KHODOROVSKY:  Well are you currently

8    in--do you currently have a storage locker?

9              MR. LIMA:  No.

10             MR. KHODOROVSKY:  Or when did you last

11   have a storage locker?

12             MR. LIMA:  (Interposing) Maybe January

13   of 2010.  No, maybe--I don't remember.  It

14   was early 2010.

15             MR. KHODOROVSKY:  But you are not

16   currently in possession of it?

17             MR. LIMA:  No.

18             MR. KHODOROVSKY:  I'm sorry; stay on the

19   same page.  You see there are transactions

20   again; Mr. Biertzer made, to the best of your

21   knowledge, $410.26, on March 2nd, '09, sent

22   park auto draft in Nashville.  Do you know

23   what that transaction is?

24             MR. LIMA:  This is for our parking

25   garage.

1

2          MR. KHODOROVSKY:  In where--parking

3     garage where?

4          MR. LIMA:  I--I don't know.  Well, no,

5     that can't be.  I--I don't know.  Maybe it

6     is.

7          But you don't--you don't exactly know

8     what this transaction is about?

9          MR. LIMA:  It could be for--is this a

10    recurring--you probably don't know.

11          MR. KHODOROVSKY:  I--

12          MR. LIMA:  (Interposing) If this is

13    recurring, then it's my parking garage in

14    Battery Park.

15          MR. KHODOROVSKY:  But do you currently

16    have a garage spot?

17          MR. LIMA:  No.

18          MR. KHODOROVSKY:  Okay.  Let's flip the

19    page.  Stop.  We are looking at the--at the

20    American Express card, last four digits being

21    1008, April 22nd, '09 closing date, March

22    23rd, '09 transaction.  Do you see that first

23    transaction, Health Science Nutrilenden

24    (phonetic), $154.99?  Did you make this

25    transaction?

2            MR. LIMA:  Yes.

3            MR. KHODOROVSKY:  What was it for?

4            MR. LIMA:  These are vitamins,

5        essentially.

6            MR. KHODOROVSKY:  Okay.

7            MR. LIMA:  Similar to the melaleuka.

8            MR. KHODOROVSKY:  Okay.  Let's flip the

9        page.  By the way, did you buy these vitamins

10       to resell them or for your personal

11       consumption?

12           MR. LIMA:  For personal.

13           MR. KHODOROVSKY:  Okay.  Let's--let's

14       flip the page again.  Stop when you get to

15       page three of ten, on top there.  Do you see

16       that?  Okay, great.  Excellent.  Excellent.

17       I'm going to ask you--this is the same credit

18       card, last four digits being 1008, closing

19       date May 22nd, '09, page three of ten.  I'll

20       ask you about some transactions for Mr.

21       Biertzer.  Answer to the best of your

22       knowledge.  There is a transaction April

23       25th, '09 for $122.49 at Harry and David.  Do

24       you know what this transaction is about?

25           MR. LIMA:  Yes.  This is a present for a

1

2          client.

3                    MR. KHODOROVSKY:  Of yours or of Mr.

4          Biertzer?

5                    MR. LIMA:  I'm sorry; of mine--of Pedro

6          Lima Design.

7                    MR. KHODOROVSKY:  And was the client

8          given this present?

9                    MR. LIMA:  Yes, it was a gift basket,

10         for the client, just to--

11                   MR. KHODOROVSKY:  (Interposing) What is

12         the name of the client, if you remember?

13                   MR. LIMA:  I don't remember.

14                   MR. KHODOROVSKY:  Okay.  Let's flip the

15         page.  Okay.  I see there, on May 15th, '09

16         that there is a transaction to you--bless

17         you.  This transaction, May 15th, '09 for you

18         Mr. Lima, for $205.20 at United Airlines.

19         Did you make this transaction?

20                   MR. LIMA:  Yes.

21                   MR. KHODOROVSKY:  What was it for?

22                   MR. LIMA:  I have to think here.  It's

23         for airfare.  I don't--I don't recall this

24         trip.

25                   MR. KHODOROVSKY:  Okay.

1

2          MR. LIMA:  I know that sounds crazy,

3      but--.

4          MR. KHODOROVSKY:  Okay, next line,

5      $142.19, do you see that transaction, May

6      15th, '09.

7          MR. LIMA:  Yes.

8          MR. KHODOROVSKY:  LaCoste Madison

9      Avenue, New York?

10         MR. LIMA:  Yes.

11         MR. KHODOROVSKY:  Did you make this

12     transaction?

13         MR. LIMA:  Yes.

14         MR. KHODOROVSKY:  What was this

15     transaction?

16         MR. LIMA:  This is clothing for myself.

17         MR. KHODOROVSKY:  Are you currently in

18     possession of it?

19         MR. LIMA:  Yes.

20         MR. KHODOROVSKY:  Let's flip the page.

21     And let's flip the page again.  And when we

22     go to page three of 12, up top, stop.  Are

23     you there?

24         MR. LIMA:  Yeah, I'm there.  Yes.

25         MR. KHODOROVSKY:  Excellent.  Excellent.

2        I'm going to ask you some transactions of

3        yours.  Okay, we are on page three of 12.

4        The credit card is American Express, last

5        four digits of the account number being 1008,

6        closing date being July 22nd, '09.  Okay.

7        I'm going to ask you about a transaction you

8        made--the transaction listed on July 14th,

9        '09, for $217.93 at Sims in New York.  Did

10       you make this transaction?

11            MR. LIMA:  Yes.

12            MR. KHODOROVSKY:  What did you buy?

13            MR. LIMA:  A suit.  This--at this point,

14       I needed--I was--I was attending a lot of

15       functions to represent the Society, and I

16       needed clothing to look better.  So, I--

17       that's why there are so many clothing

18       expenses at this time.

19            MR. KHODOROVSKY:  And were you

20       reimbursed for this purchase?

21            MR. LIMA:  No.  No.

22            MR. KHODOROVSKY:  Okay.  One transaction

23       below - - the one below.  Do you see July

24       16th, '09, a $15.00 charge for Delta

25       Airlines, LaGuardia?

1

2        MR. LIMA:  Yes.

3        MR. KHODOROVSKY:  Did you travel

4   anywhere on Delta Airlines around this time?

5        MR. LIMA:  Yes, I did.  And I remember

6   the other one.  Yes, I did.

7        MR. KHODOROVSKY:  Where did you travel?

8        MR. LIMA:  I traveled to Chicago for a

9   conference, and I was reimbursed for that

10  trip as well.

11       MR. KHODOROVSKY:  Okay, so let's go down

12  one line.  Do you see there a transaction on

13  July 16th, '09, a charter service transaction

14  it says $24.00 Exec Air, did you make this

15  transaction?

16       MR. LIMA:  Yes.

17       MR. KHODOROVSKY:  What was it for?

18       MR. LIMA:  This is for transportation.

19  I think it was either--I don't remember which

20  end--

21       MR. KHODOROVSKY:  (Interposing) For an

22  airport charter bus?

23       MR. LIMA:  Yes.  Yes, I think it was

24  for--at the--when I got there, to get--or it

25  might have been to the airport.  I'm sorry; I

2          don't remember, but this was in the beginning

3          just transportation.

4                MR. KHODOROVSKY:  And were you

5          reimbursed for this?

6                MR. LIMA:  Yes, I was.

7                MR. KHODOROVSKY:  Let's look down one

8          line.  July 21st, '09, Carmel Car Service in

9          Mamaroneck, $39.00.  Did you make this

10         transaction?

11               MR. LIMA:  Yes.

12               MR. KHODOROVSKY:  And what is it for?

13               MR. LIMA:  This was also transportation

14         from the airport to home, to my apartment.

15               MR. KHODOROVSKY:  Were you reimbursed

16         for it?

17               MR. LIMA:  Yes, I was reimbursed.

18               MR. KHODOROVSKY:  Okay.  Staying on the

19         same page, I have some questions about Mr.

20         Birder's transactions.  Again, answer to the

21         best of your knowledge.  Do you see there's

22         a--there are two transactions, on that page,

23         for June 27th, '09, at the Brooklyn Botanical

24         Garden, one for $25.00 and one for $27.30.

25         They are right next to each other.  Do you

see that?

MR. LIMA:  Yes.

MR. KHODOROVSKY:  Do you know what these

transactions are about?

MR. LIMA:  Yes.  This was to--to see

the--this was an admissions fee to see the--

the gardens.

MR. KHODOROVSKY:  For one person or for

two persons?

MR. LIMA:  For two people.

MR. KHODOROVSKY:  So--so, it's $25.00

for one person and $27.30 for the other?

MR. LIMA:  No.  No, this is--this is--

the first one; I apologize.  The first, the

$25.00 is the admissions.  The $27.30 was a--

a gift that Peter purchased, like a--I don't

remember--oh, yes I do.  It was for his--for

a relative, he purchased a--a present--a

couple of little presents for his godson.

MR. KHODOROVSKY:  So, he is not

currently in possession of those items?

MR. LIMA:  No.

MR. KHODOROVSKY:  Okay.

MR. LIMA:  No, I apologize.  It was--

1

2          MR. KHODOROVSKY:  (Interposing) That's

3      fine.  Let's flip the page.  Okay, we are on

4      the same statement.  I'm sorry--I'm sorry; we

5      are not on the same--we are on the same

6      statement, but page five of 12.  Do you see

7      there July 22nd, '09?

8          MR. LIMA:  Yes.

9          MR. KHODOROVSKY:  Again credit card

10      American Express, last four digits being

11      1008.  Do you see that transaction of July

12      15th, '09, Twenty-Twenty Optical in New York,

13      $175.00?

14          MR. LIMA:  Yes.

15          MR. KHODOROVSKY:  Okay.  Did you make

16      this transaction?

17          MR. LIMA:  Yes.

18          MR. KHODOROVSKY:  And what was it for?

19          MR. LIMA:  These are, again are for

20      Peter, for his glasses.  This is when they

21      put the lenses into his--

22          MR. KHODOROVSKY:  (Interposing) And is

23      he in possession of those glasses?

24          MR. LIMA:  Yes.

25          MR. KHODOROVSKY:  Okay.  Let's move to

the next page.  We are on the, again American

Express statement, closing date being August

21st, '09, for Mr. Lima, last four digits of

the account number being 1008.  Do you see

there a transaction, at the--for $115.92 on

July 24th, '09 to the New York Wine Exchange?

        MR. LIMA:  Yes.

        MR. KHODOROVSKY:  Did you make this

transaction?

        MR. LIMA:  Yes.

        MR. KHODOROVSKY:  What was this for?

        MR. LIMA:  This is for alcohol for Peter

and myself and a few friends, at my

apartment.

        MR. KHODOROVSKY:  Has it been consumed?

        MR. LIMA:  Yes.

        MR. KHODOROVSKY:  Okay.  All of it?

        MR. LIMA:  Yes.

        MR. KHODOROVSKY:  Okay.  Let's flip the

page.  Okay.  We are on the American Express

statement for--for Mr. Lima, last four digits

of the account number 1001, closing date

April 28th, '07.  Do you see--are you there?

        MR. LIMA:  Yes.

MR. KHODOROVSKY:  Do you see there a

transaction, March 25th, '07, U.S. Treasury

Tax Payment $600.00?

MR. LIMA:  Yes.

MR. KHODOROVSKY:  Did you make this

transaction?

MR. LIMA:  Yes.

MR. KHODOROVSKY:  Was this s tax

payment?

MR. LIMA:  Yes.

MR. KHODOROVSKY:  To the IRS?

MR. LIMA:  Yes.

MR. KHODOROVSKY:  Okay, let's go--that's

fine.  Let's flip the page.  And let's flip

the page again.  Okay, let's stay there.  It

is page three of ten, closing date of the

statement being May 28th, '07; it is the

American Express card with the last four

digits being 1001.  Are you there?

MR. LIMA:  Yes.

MR. KHODOROVSKY:  Excellent.  Do you see

there the very last transaction, for Mr.

Biertzer?

MR. LIMA:  Yes.

2              MR. KHODOROVSKY:  To the best of your

3         knowledge, answer to the best of your

4         knowledge.  May 27th, '07, Esprite in New

5         York, New York for $49.50.  Do you know what

6         that is for?

7              MR. LIMA:  Yes, this is clothing.

8              MR. KHODOROVSKY:  For whom?

9              MR. LIMA:  For me.  He purchased this

10         for myself, and I have--actually, I think I

11         wore it out.  So, I threw it out.

12              MR. KHODOROVSKY:  Okay.  Up above, do

13         you see there a transaction, on May 27th,

14         '07, and also by Mr. Biertzer, Paul Retain,

15         New York, New York for $149.00?

16              MR. LIMA:  Yes.

17              MR. KHODOROVSKY:  Do you know what that

18         transaction is for?

19              MR. LIMA:  Yes, this is also for

20         clothing.

21              MR. KHODOROVSKY:  For whom?

22              MR. LIMA:  For me.

23              MR. KHODOROVSKY:  Are you in possession

24         of it?

25              MR. LIMA:  Yes.

1

2          MR. KHODOROVSKY:  Okay.  Let's flip the

3     page.  Okay.  We are on page three of eight,

4     statement with a closing date of June 28th,

5     '07, American Express card for Mr. Lima, last

6     four digits of the account number being 1001.

7     Do you see a transaction, if you go down--do

8     you see a transaction on June 15th, '07 for

9     $77.00, War Between the States, the

10    Villagers, Florida.  Oh, I'm sorry; that's a

11    Mr. Biertzer transaction.  I'm sorry.

12         MR. LIMA:  Yes.

13         MR. KHODOROVSKY:  I apologize.  That's

14    for Mr. Biertzer.  Do you see that

15    transaction?

16         MR. LIMA:  I do, yes.

17         MR. KHODOROVSKY:  Are you familiar--do

18    you know what that transaction is?

19         MR. LIMA:  No.

20         MR. KHODOROVSKY:  Okay.  Let's flip the

21    page.  Okay, we are on page three of eight,

22    credit card for Mr. Lima, account number last

23    four digits being 1001, American Express

24    card.  Are you there?

25         MR. LIMA:  Yes.

2          MR. KHODOROVSKY:  Excellent.  Excellent.

3     Do you see there a transaction on July 5th,

4     '07, for $337.91 at Armani, Gildo, Zagnia, in

5     Central Valley, New York, for Mr. Biertzer?

6     Do you see that transaction?

7          MR. LIMA:  Yes.

8          MR. KHODOROVSKY:  Do you know what that

9     transaction was?

10         MR. LIMA:  This is clothing for Peter,

11    purchase by Peter.

12         MR. KHODOROVSKY:  Is he in possession of

13    it?

14         MR. LIMA:  Yes.

15         MR. KHODOROVSKY:  Okay.  And right below

16    it, do you see a transaction on July 5th,

17    '07, $355.33 at Woodberry Commons in Central

18    Valley, New York?

19         MR. LIMA:  Yes.

20         MR. KHODOROVSKY:  Do you know what that

21    transaction is?

22         MR. LIMA:  Yes.  This is also for

23    clothing.

24         MR. KHODOROVSKY:  Mm hmm.  For whom?

25         MR. LIMA:  For--I don't recall.  One or-

2          -either him or myself.

3               MR. KHODOROVSKY:  Okay.  Let's flip the

4          page.  And let's flip the page again.  We are

5          close to finishing.  And let's flip the page

6          again.  Actually, I'm sorry; let's go back.

7          I apologize.  I forgot to ask--stay--stay

8          there.  Do you see there a page one of ten,

9          for your credit card statement for Mr. Lima

10         American Express, last four digits of the

11         account number being 1001?

12              MR. LIMA:  Yes.

13              MR. KHODOROVSKY:  Okay.  Do you see

14         there a transaction, March 24th, of '08, for

15         $75.00 for you for Onsite Rental Express, Los

16         Altos, California?

17              MR. LIMA:  Yes.

18              MR. KHODOROVSKY:  Did you make this

19         transaction?

20              MR. LIMA:  Yes.

21              MR. KHODOROVSKY:  What was it?  To the

22         best of your knowledge?

23              MR. LIMA:  I don't recall.

24              MR. KHODOROVSKY:  Okay.  Let's flip the

25         page.  And let's flip the page again.  And

2          I'm going to ask you about one last--actually

3          two last transactions.  And we're going to be

4          done with regards to your credit card

5          statements.  We are on the American Express

6          credit card, statement closing date April

7          29th, '08, last four digits of the account

8          number being 1001; we are on page three of

9          five.  I'm going to ask you about two

10         transactions on this--by Mr. Biertzer.  Do

11         you see here a transaction on March 30th, of

12         '08, for $704.43 at CostCo.com?

13              MR. LIMA:  Yes.

14              MR. KHODOROVSKY:  Do you know what this

15         transaction was?  If you don't remember--

16              MR. LIMA:  (Interposing) I don't

17         remember.

18              MR. KHODOROVSKY:  Okay.

19              MR. LIMA:  I'm sorry; I don't remember.

20              MR. KHODOROVSKY:  Okay.  Go down one

21         line, and one more line, do you see there a

22         transaction for $388.99 by Mr. Biertzer, on

23         April 3rd, '08 at Mercantila el sin,

24         California?

25              MR. LIMA:  Yes.

1

2          MR. KHODOROVSKY:  Do you know what that

3      transaction is about?

4          MR. LIMA:  I do not.

5          MR. KHODOROVSKY:  Okay.

6          MR. LIMA:  It's related to his company,

7      but I don't know specifically what that was.

8          MR. KHODOROVSKY:  Okay.  Let me ask you

9      this question, because we are done with the

10     credit card statements.  You're almost done

11     for today.  At least with my portion of the

12     questions.  Let me ask you this.  Are you--

13     does Mr. Biertzer reside with you currently?

14         MR. LIMA:  Yes.

15         MR. KHODOROVSKY:  Does he--is he

16     currently employed?

17         MR. LIMA:  I'm sorry?

18         MR. KHODOROVSKY:  Does he currently--is

19     he currently employed?  Does he have a job?

20         MR. LIMA:  Yes.

21         MR. KHODOROVSKY:  Where does he work?

22         MR. LIMA:  He works for Dr. Buddisaw

23     (phonetic), which is a dental practice.  He

24     is the office manager for the dental

25     practice.

2          MR. KHODOROVSKY:  To the best of your

3     knowledge, how much does he earn?

4          MR. LIMA:  He earns roughly $85,000.00.

5          MR. KHODOROVSKY:  A year?

6          MR. LIMA:  A year--yearly.

7          MR. KHODOROVSKY:  And to the best of

8     your knowledge, how long has he had this job?

9          MR. LIMA:  Six years.

10          MR. KHODOROVSKY:  Okay.  Actually, I do

11     want to ask you some questions about your--

12     your Schedule J, back on the schedules.  If

13     you can't find them, let me--let either me or

14     your counsel help you.  And we are almost

15     done, - - .

16          MR. LIMA:  Yeah, I'm sorry.

17          MR. KHODOROVSKY:  Take a look at

18     Schedule J again.  Are you there?

19          MR. LIMA:  Yes.

20          MR. KHODOROVSKY:  Okay, great.  Can you

21     tell me, does Mr. Biertzer pay for any of the

22     expenses, or share any of the expenses listed

23     here on Schedule J?

24          MR. LIMA:  No.

25          MR. KHODOROVSKY:  You pay personally for

2          all of these expenses?

3                    MR. LIMA:  This is my--yes.  I went

4          through it to make sure I wasn't, you know,

5          but no, these are my personal expenses.

6                    MR. KHODOROVSKY:  All these are your

7          personal expenses and he doesn't pay for any

8          of them?

9                    MR. LIMA:  Yes.

10                   MR. KHODOROVSKY:  Let's flip the page.

11         On the next page, do you see the other

12         expenses listed there?

13                   MR. LIMA:  Yes.

14                   MR. KHODOROVSKY:  And do you pay for

15         them personally or does Mr. Biertzer

16         contribute to any of these?

17                   MR. LIMA:  I think we--he does help with

18         the pet care.

19                   MR. KHODOROVSKY:  And how much, do you

20         think, of that $100.00 a month, does he pay?

21                   MR. LIMA:  I would say $50.00.

22                   MR. KHODOROVSKY:  Okay.  Anything else?

23                   MR. LIMA:  That's--that's it.

24                   MR. KHODOROVSKY:  Okay.  Okey dokey.

25         Mr. Lima, I have no further questions for you

today.  Counsel, do you have any questions

for Mr. Lima?

    MR. HAMILTON:  No.

    MR. KHODOROVSKY:  Would you like to

cross examine him?

    MR. HAMILTON:  No.

    MR. KHODOROVSKY:  Okay.  We are now off

the record, on August 27th, 2010 at 1:55 p.m.

We're done.

    [END OF HEARING]

# C E R T I F I C A T E

I, Joyce A. Waser, certify that the foregoing transcript of proceedings in the Bankruptcy Court of the 341 Hearing of Pedro Lima, Case No. 10-11809 was prepared using standard electronic transcription equipment and is a true and accurate record of the proceedings.

Tape #__1005 and 1006_____

Counter #s __N/A_____ to _____

Signature_____

Date _September 30th, 2010_____

ERRATA SHEET FOR TRANSCRIPT OF _____

RE: _____   DATE TAKEN: _____

PAGE      LINE #        CORRECTION        REASON

_____

WITNESS' NAME

SUBSCRIBED AND SWORN TO THIS

_____ DAY OF _____, 200____

_____

**Ubiqus/Nation-Wide Reporting & Convention Coverage**
22 Cortlandt Street – Suite 802, New York, NY 10007
Phone: 212-227-7440 * 800-221-7242 * Fax: 212-227-7524